Edward WITHERS

v.

Mark A. LEVINE et al.

Civ. No. Y–74–356.

United States District Court,
D. Maryland.

April 21, 1978.

Charles M. Kerr, Craig E. Smith, Baltimore, for plaintiff.

Donald R. Stutman, Asst. Atty. Gen., Baltimore, for defendants.

JOSEPH H. YOUNG, District Judge.

Edward Withers, presently incarcerated at the Maryland Penitentiary, brings this

civil rights action pursuant to 42 U.S.C. § 1983 seeking compensatory, declaratory and injunctive relief against officials of the Maryland Division of Correction for failing to take reasonable measures to protect him from sexual assault. Plaintiff also alleges that the defendants breached their state tort law duty to afford reasonable protection to inmates.

Since the factual and legal bases for the two claims are substantially the same, they will be considered together. All findings of fact and conclusions of law are made in accordance with Rule 52 F.R.Civ.P., whether or not so stated.

## I. PLAINTIFF WAS SEXUALLY ASSAULTED BY LEON REDD.

On November 1, 1973, Withers was transferred from the Maryland Correctional Institution (MCI) to the Maryland House of Correction (MHC) and placed in a two-man cell on the idle tier, already occupied by Leon Redd. Plaintiff alleges that Redd sexually assaulted him during his second night in the cell.

Plaintiff described the incident and surrounding circumstances as follows: on the night of November 2, 1973, at approximately 10:30 or 11:00 when the cell was locked, Redd held a razor blade to his neck, and used a considerable size advantage to force plaintiff to submit to homosexual activity. Plaintiff called for help and asked inmate Edward Haynes, who walked by the cell, to summon a guard. When Haynes passed the cell a second time, he chose not to involve himself in the incident, due to threats by Redd. After the rape, Redd also threatened to kill plaintiff if he called a guard. The following morning plaintiff considered obtaining a weapon to deal with Redd, but decided, instead, to report the incident to officials, after a conversation with some inmates whom he had known before incarceration. After the report, he was examined at University Hospital and placed on protective custody.

Edward Haynes testified that he called a guard at Wither's request, believing that Withers was sick, but received no response. He did not indicate to the guard that an assault was in progress. Upon passing the cell a second time, Haynes first realized that the problem was one of assault, and did not involve himself further because of Redd's threats to him. Both Haynes and Withers testified that they were on an upper tier, that guards were stationed at the bottom level, and that no guard was on their level when the incident occurred.

Jonathan Dickey testified that he was an inmate at MHC in November, 1973. On November 3, plaintiff asked for a weapon to use against the cellmate, who had raped him. Dickey advised plaintiff to report the incident to the authorities.

Documents in plaintiff's base file give the following information: on November 3 he reported a sexual assault and went to University Hospital for examination. The doctor there found an anal fissure and prescribed sitz baths and suppositories. Plaintiff was placed on protective custody. The adjustment team found Redd guilty of perverted practices, but not guilty of assault. The team's conclusion was based in part on Wither's statement that no violence was used in the assault.

Redd testified that the homosexual activity was consensual and defendants argued that Withers consented to the incident. There was evidence that an anal mucosal tear can result from consensual, as well as nonconsensual, homosexual acts. The University Hospital emergency room record stated that the injury was "consistent with but not conclusive of assault. . . ."

Defendants also introduced an adjustment team report, finding plaintiff guilty of engaging in a homosexual act with his cellmate, Stanley Dickerson, at the Maryland Penitentiary in 1975.[1] At trial, plaintiff and Dickerson both testified that this conclusion was erroneous, Withers denying

---

1. Some documents in file refer to plaintiff as "Larry Carl". It is agreed that Larry Carl and Edward Withers are one and the same.

that he had ever consented to homosexual acts.

The evidence also included a 1964 petition to the Baltimore City Juvenile Causes Division, alleging in part, that plaintiff had engaged in a perverted sex act when he was thirteen years old.

Determining whether a sexual act is consensual or assaultive is inevitably a matter of some difficulty, and is not susceptible of mathematical proof. The greater weight of the credible evidence indicates that plaintiff was sexually assaulted by Leon Redd.

Inmate Haynes, the only person who witnessed any part of the occurrence, testified that he saw assaultive behavior. Dickey testified that plaintiff wanted a knife to use against his cellmate the very morning after the incident, and the prompt report of the assault and the medical evidence must also be considered. Testimony by hearing officer Tilley established clearly that the MHC adjustment team did not have the medical evidence when it concluded that Redd had engaged only in a perverted practice, not an assault. While Tilley indicated that the medical report would not have been conclusive of assault, he indicated that it might have changed the decision.

Plaintiff's allegations that he never engaged in consensual activity are not altogether credible. Neither his testimony nor that of Stanley Dickerson rebutted the finding of a homosexual incident in 1975 at the Penitentiary. However, it is not that incident which is in issue here. Further, the fact that Withers may have engaged in a consensual act in 1975 does not significantly reduce the probability that he was raped two years earlier. Such a sequence of events is highly plausible.

There was considerable, undisputed testimony to the effect that an inmate, prone to sexual victimization, can minimize his harm, by agreeing to some homosexual activity. Other cases which have discussed the problem of homosexual rape record the phenomena of a vulnerable inmate choosing submission or the protection of a "man" to ameliorate his problem. *E. g., Anderson v. Redman,* 429 F.Supp. 1105, 1115 (D.Del.

1977); *Chapman v. Rhodes,* 434 F.Supp. 1007, 1017 (S.D.Ohio 1977).

▮ Assuming *arguendo* that Withers told the adjustment team that Redd used no violence, the absence of such force is not inconsistent with assault. When fear weakens resistance, the aggressor may not actually need to exert the threatened force to secure compliance. But it is nonetheless an assault.

Fear of provoking further brutality or of advertising one's plight by vigorous protest is also highly believable under the norms of prison life. In *Anderson v. Redman, supra,* the Court stated:

> By the time an inmate reaches his initial classification destination, be it maximum, medium, or minimum, it is difficult to discern nonconsensual homosexual activity, because the resistance of most nonconsensual victims has been broken by that time.

429 F.Supp. at 1117, for 31.

In the instant case, plaintiff testified that Redd threatened him with a razor and was much bigger physically. Under such circumstances, actual force might well have been unnecessary.

Several inmates testified convincingly that victims can expect no aid from their fellow inmates. In fact, if the incident becomes widely known, victims are permanently stigmatized and face future risks. While it is difficult to verify inmate testimony about the number and details of particular rapes, their testimony as to prisoners' *reactions* to assault presents no problem of credibility. On the contrary, it rings loud and true.

Defendants did not dispute these patterns of inmate behavior. Officials, including correctional officers, testified to the fears which militate against bringing homosexual assaults to light. Given the prevailing attitudes among inmates, a prisoner subjected to attack may well conclude that a vigorous resistance which advertises the event will increase both his immediate and long-range harm, with little hope of benefit. In short, evidence that force was not used, even if

true, does not really contradict the evidence which is probative of assault.

Documents in plaintiff's base file make this a particularly logical conclusion in his case. During a prior stay at MHC, he wrote to the Warden, indicating that he could not effectively cope with sexual advances on his own. The Warden was sufficiently convinced of these difficulties to transfer him to MCI because of them and because of his age. Wither's testimony, and a reference in that letter, indicate his firmly held belief that he was sexually assaulted upon first entering the prison system as a teenager, and that this set the stage for future difficulties.

Records from Clifton T. Perkins Hospital show that plaintiff suffered a psychotic episode shortly after he entered the Baltimore City Jail, his first experience with incarceration. Although his mental condition was such that he cannot actually remember an assault, plaintiff's best efforts at reconstructing events, including memories of threats, lead him to believe that the episode was triggered by an assault.

■ The preponderance of the testimonial and documentary evidence presented at trial proves that Edward Withers was subjected to a sexual assault by his cellmate, Leon Redd, at the Maryland House of Correction on November 2, 1973. The defendants did not then, and do not now, employ written, uniform procedures to assure that safety is a main criterion in the initial placement of inmates, newly admitted or transferred from other institutions.

Withers and Redd were placed together without prior review of their prison records and known characteristics to assess their suitability as cellmates. By this omission, defendants unnecessarily increased the risks of harm, always present when two inmates are placed together in the same cell. The absence of proper procedure for making an initial cell assignment allowed harm to come to plaintiff, and violated his right, secured by the Eighth and Fourteenth Amendments, to be reasonably protected from harm at the hands of his fellow inmates.

Classification of prisoners is a matter of discretion for prison officials. Courts will not ordinarily substitute their judgments for those of the officials. *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); *Montanye v. Haymes,* 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976); *Sweet v. South Carolina Department of Corrections,* 529 F.2d 854 (4th Cir. 1975). Plaintiff's constitutional right to protection was not violated because of an error in judgment, but because there was *no* informed judgment made in his case.

For all the above reasons, the Court finds that plaintiff was sexually assaulted by his cellmate, Leon Redd, at MHC on November 2, 1973. Accordingly the request for declaratory and injunctive relief will be granted and the request for money damages will be denied.

## II. DEFENDANTS DID NOT EXERCISE REASONABLE CARE TO PROTECT PLAINTIFF FROM THE POSSIBILITY OF SEXUAL ASSAULT.

■ While occasional, isolated attacks among prisoners do not amount to cruel and unusual punishment, a prisoner has a right, through the Eighth and Fourteenth Amendments, to receive reasonable protection from harm by other inmates. Both actual assault and constant fear of assault are undue burdens to place upon a prisoner. *Woodhous v. Commonwealth of Virginia,* 487 F.2d 889 (4th Cir. 1973); *Penn v. Oliver,* 351 F.Supp. 1292 (E.D.Va.1972). A pattern of fears and incidents may be proven by testimony about other institutions in the area, not just MHC. *Woodhous, supra; Holt v. Sarver,* 442 F.2d 304, 308 (8th Cir. 1971).

The question for consideration now is whether the defendants have met their responsibility under the facts of this case. The conclusion is that they have not.

Evidence at trial clearly establishes that the initial housing assignment of inmates transferred to MHC is ordinarily made on a space available basis, without consideration of other factors or any prior review of the

base file. Incoming inmates are generally placed in double cells on the idle tier. This routine was followed in plaintiff's case.

Although the base file is usually received at MHC with the inmate, it is sent to the records office, and is not available to the officer making the initial cell assignment. That officer, who is the correctional officer on duty at the time, rather than a classification counsellor, ordinarily has only the name and number of the inmate. The transferor institution sometimes alerts the receiving institution about special problems, but this is not a systematic procedure, and there is no fail safe-mechanism to assure that it will be done.

Dr. Stanley Brodsky and Sanger Powers, experts on correctional practices who testified for plaintiff and defendants respectively, both stated that safety should be the primary goal in housing inmates. They agreed that accountability is difficult without written guidelines. Powers stated that he would expect to find written procedures for newly arrived inmates.

No Division of Correction or MHC rule guides the decision as to which inmates should be housed together. This absence of procedure, in particular the failure to utilize readily available information in the base files of old and new inmates, to make initial placements as safe as reasonably possible, falls below the standard of care required of prison officials.

Assuming *arguendo* that base files are sometimes flagged with special information, and accepting the testimony that this system is being improved, it is not meaningful if the information is not put in the hands of those who can use it beneficially.

The reception period is critical and all available information should be utilized, for the safety of the new inmate and of other inmates. Uncontradicted testimony establishes that a prisoner can be stigmatized by early, unfortunate experiences. This pattern is apparent in plaintiff's case. Prison officials are well aware of the vulnerable position of the new prisoner and have an obligation to adopt procedures which lessen the risks to the extent possible. While this is particularly true of inmates entering prison for the first time, it is also true for transferees from other institutions.

It is beyond dispute that giving each man an individual cell (single celling) is the housing option of choice to protect inmates and promote well-being generally. Double celling increases the potential for harm. Mr. Powers testified that in Wisconsin, the state with which he is most familiar, some double celling is just being instituted, due to financial pressures. He believed there should be efforts to judge the compatibility of new prisoners, and that reception would be the last place to consider double celling.

When new arrivals are double celled, the need for precautions increases. There must be an informed selection process by qualified personnel, which takes into account the records and known characteristics of the men being placed together. Mr. Powers testified that the more double celling is used, the harder it becomes to assure a level of compatibility. In Maryland, double celling has become a way of prison life. However, the impossibility of attaining ideal placements does not excuse officials from the duty of making informed placements.[2]

Given both the limits of human judgment and the realities of prison life, the best decisional process will not guarantee safety in every instance. As was aptly stated in *Penn v. Oliver, supra:*

> It would be fantasy to believe that even the most enlightened prison officials operating with unlimited resources could prevent all acts of violence within the prison.

351 F.Supp. at 1294.

As stated above, in holding that defendants breached their duty of care toward Withers by placing him with Redd, the Court does not establish a precedent for reviewing the judgments of prison officials

---

**2.** Although the Court does not reach this issue, defendants' argument about the difficulty of reasonably suitable assignments once double celling is widespread argues against the use of the practice, not in favor of lowering the constitutional duty to afford protection.

whenever an unfortunate result occurs. It is the absence of procedure, not a mere error, which rises to the level of a constitutional violation in this case.

Review of readily available information about Redd and Withers would have disclosed that the former had a history of assaultive behavior, and the latter a concern with sexual victimization. The file would also have shown that plaintiff's transfer out of MHC one year earlier was motivated in large part by this concern. But there was no review.

The possibility of sexual assault, particularly for the newly arrived young prisoner, is by no means unlikely. Officials cannot claim that the assault on plaintiff was such an isolated occurrence that there is no obligation to guard against it.

It is not necessary to rely on the extremely high figures for sexual assaults suggested by some inmates to be convinced that such incidents are a real danger, and a source of great fear among many prisoners. The story is vividly told in a memorandum by J. Brown Hardy, Deputy Commissioner of Corrections, dated May 15, 1975, which refers to the "high incidence of violent assaults and homosexual rapes" in the prisons.

The Court heard testimony from Retired Judge Charles Harris, former member of the Supreme Bench of Baltimore and Chairman of a state advisory board dealing with correctional problems. Judge Harris has actively tried to ameliorate the problems of sexual assaults, particularly among younger prisoners, and to associated fears which prevent those assaults from being reported. In his experience, officials respond appropriately to reported incidents, but many incidents go unreported. This testimony is borne out by the testimony of numerous other witnesses, including, but not limited to, inmates. Dr. Brodsky testified that intimidation and humiliation both keep victims silent. Deputy Commissioner of Corrections Herndon agreed that fear of stigmatization and future harm caused incidents to go unreported.

There is no credible evidence in this case that officials failed to deal with reported assaults, or that correctional officers ignored or perpetuated such incidents. Nor does the evidence indicate that the correctional officers on the tiers ignore their supervisory responsibilities. But the above evidence does establish that it is unreasonable to rely solely on these measures to cope with the problem. When it is clear that most assaults will not be reported and that the pressures against reporting are real, officials must consider preventive measures.

The idle tier where men are placed without preliminary screening is excessively dangerous. By any estimate, the ratio of officers to inmates is very low, particularly for supervising double celled inmates. Further, the idle tier, by definition, houses inmates whose energies are not channelled into job assignments. Marcellus Moore, Assistant Warden of Treatment at MHC, testified that transferees are often kept on idle tier for as much as sixty days until classification team review.

Declaratory and injunctive relief requires that within a reasonable time, defendants promulgate and implement written procedures for the initial housing assignment of arriving inmates, in which safety is a leading criterion. The Court is not unmindful of the difficulties faced by prison authorities. However, the initial placement of prisoners is a critical matter which requires informed decision making by an informed official. Assignments primarily on a space-available basis is not sound practice and falls below the level of protection to which an inmate is entitled.

Systematic, preliminary screening to identify special problems and review the compatibility of cellmates generally should be addressed in any proposed plan. Officials should also consider other options to reduce risks, i. e., more guards assigned to idle tier, single cell more incoming inmates. These suggestions are not intended to be exhaustive. The experience and expertise of prison officials should produce procedures, which utilize various alternatives, far better than a particular formulation which might be made by this Court.

■ The request for damages will be denied. In *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), the Supreme Court concluded that the common law doctrine of absolute judicial immunity was applicable to actions under § 1983. Denying immunity from monetary costs in some circumstances "would contribute not to principled and fearless decision making but to intimidation." *Id.* at 554, 87 S.Ct. at 1218.

In *Scheuer v. Rhodes,* 416 U.S. 232, 247–48, 94 S.Ct. 1683, 1692, 40 L.Ed.2d 90 (1974), officers of the executive branch of government were held to have a qualified immunity to § 1983 damages "dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based."

This reasoning was extended to school board officials in *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). Discussing the immunity standard, the Court explained that the "good faith" test has both objective and subjective aspects, stating:

> The official himself must be acting sincerely and with a belief that he is doing right, but an act violating a student's constitutional rights can be no more justified by ignorance or disregard of settled, indisputable law on the part of one entrusted with supervision of students' daily lives than by the presence of actual malice.

*Id.* at 321, 95 S.Ct. at 1000. The Court went on to hold that:

> A compensatory award will be appropriate only if the school board member has acted with such an impermissible motivation or with such disregard of the student's clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith.

*Id.* at 322, 95 S.Ct. at 1001. These criteria are applicable to prison officials. *Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978).

In the instant case, defendants have a constitutional duty to afford inmates reasonable protection from harm. While this duty is not discretionary, prison officials do exercise discretion in choosing the means to best promote the goal. *Procunier v. Navarette, supra.* There is no indication under the facts of this case that defendants acted with improper motivation. While the inmates' right to protection is clearly established, officials should not be unduly burdened with failure to correctly interpret the requirements of that duty in every situation. The 1975 memorandum by J. Brown Hardy, referred to above, indicates that defendants were making some efforts to deal with the problem of assaults.

In *Wood v. Strickland, supra,* the Court stated that:

> . . . however worded, the immunity must be such that public school officials understand that action taken in the good-faith fulfillment of their responsibilities and within the bounds of reason under all the circumstances will not be punished and that they need not exercise their discretion with undue timidity.

420 U.S. at 321, 95 S.Ct. at 1000. In light of the above principles, an award of damages is not appropriate under the facts of this case.

Accordingly, it is this 21st day of April, 1978, by the United States District Court for the District of Maryland, ORDERED:

1. That the request for declaratory and injunctive relief be, and the same is, hereby GRANTED;

2. That the defendants violated plaintiff's constitutional right to protection when they assigned him to a cell with Leon Redd on a space-available basis, without any prior review or informed decision to assure his safety;

3. That the defendants, within a reasonable time, promulgate written procedures to promote safe initial placement of inmates at MHC, consistent with the findings in this opinion; and

4. That the request for damages be, and the same is, hereby DENIED.