Charles E. JOHNSON and Charles A. Hunter, Individually and on behalf of all others similarly situated, Plaintiffs,

v.

Mark A. LEVINE, Commissioner, Division of Correction, Maryland Department of Public Safety and Correctional Services, Ralph L. Williams, Warden, Maryland House of Correction, Robert J. Lally, Secretary, Department of Public Safety and Correctional Services and Marvin Mandel, Governor of the State of Maryland, Defendants.

Charles A. HUNTER, Plaintiff,

v.

Ralph L. WILLIAMS, Warden, Maryland House of Correction, Defendant.

Civ. No. H–77–113.

United States District Court,
D. Maryland.

May 17, 1978.

Paul D. Bekman and Nevett Steele, Jr., Baltimore, Md., for plaintiffs.

Francis B. Burch, Atty. Gen. of Md., Stephen B. Caplis and W. Timothy Finan, Asst. Attys. Gen. of Md., Baltimore, Md., for defendants.

ALEXANDER HARVEY, II, District Judge:

In this consolidated class action, the plaintiffs, who are state prisoners, are challenging as unconstitutional conditions of confinement at the Maryland House of Correction (the "MHC"), a medium-security penal institution under the jurisdiction of the Department of Public Safety and Correctional Services of the State of Maryland. The essential claim here is that the MHC is unconstitutionally overcrowded and that, as a result, the plaintiffs are being deprived of various rights guaranteed by the United States Constitution.

Commencing in early 1977, many different suits were filed in this Court under 42

U.S.C. § 1983 by inmates confined in the MHC, all raising the basic question of overcrowding at that institution.[1] Orders were entered consolidating three of these suits and certifying Civil No. H–77–113 as a class action, pursuant to Rule 23, F.R.Civ.P.[2] The class includes all persons who are now or will be in the future confined to the Maryland House of Correction and who are state prisoners convicted and sentenced in state courts and remanded to the custody of the Commissioner of Corrections.[3] Other individual suits raising the same questions presented herein have been stayed pending the outcome of this consolidated class action.

Named as defendants in this case are the Commissioner of the Maryland Division of Correction, the Warden of the MHC, the Secretary of the Maryland Department of Public Safety and Correctional Services, and the Governor of the State. Plaintiffs here seek only declaratory and injunctive relief.

In the complaint, the plaintiffs assert that the MHC is severely overcrowded and that the degree of overcrowding threatens the physical and psychological safety of its inmates and otherwise violates their rights under the Eighth and Fourteenth Amendments. Specifically, plaintiffs assert inadequacies at the MHC in medical facilities, sanitation and hygiene, vocational and other rehabilitative programs, psychological and psychiatric counseling and facilities, discipline and punishment, parole and release procedures and the operation of a meaningful classification system. Defendants concede that the MHC is overcrowded from a correctional point of view, but assert that the institution's overcrowded condition does not reach constitutional proportions. Defendants further contend that inmates at the MHC receive adequate food, shelter and medical care, and that the institution's medical and psychiatric facilities and its programs and services are adequate to meet constitutional standards.

The parties have agreed that the basic and central questions to be decided by the Court are whether the MHC is unconstitutionally overcrowded, and if so, the number of inmates which can be constitutionally confined at the institution. As relief, the plaintiffs, inter alia, specifically request that the Court limit the number of inmates confined at the MHC to 912, that the Court order that facilities at the MHC known as the "punitive segregation area" and the "Special Confinement Area" (the "SCA") be closed; that the Court order the defendants to provide additional medical personnel and emergency treatment and equipment to meet the medical needs of inmates at the MHC, and that attorney's fees be awarded to counsel for the plaintiffs.

Following extensive pretrial discovery and numerous conferences with the Court, the case came on for trial before both the undersigned Judge and Judge Blair, sitting without a jury.[4] Shortly before the trial, the undersigned Judge, accompanied by counsel, made an extensive tour of substan-

1. All of these suits were assigned to the undersigned Judge. Other actions, similarly challenging conditions at the Maryland Penitentiary, a maximum-security institution, were assigned to Judge Blair.

2. Civil No. H–77–113 is a suit under § 1983, seeking injunctive and declaratory relief. Civil No. H–77–1460 is a habeas corpus action in which petitioner is seeking his release from custody because of the alleged overcrowding. The third consolidated case, Civil No. H–77–1459, has been dismissed at the request of the plaintiff.

3. A formal notice listing the issues in the case and signed by counsel for the plaintiffs was posted at the MHC. The names and addresses of counsel were provided in the notice, and inmates desiring to confer about the issues were invited to contact the attorneys named.

4. The same experts testified concerning conditions at both the MHC and the Maryland Penitentiary. Since there was some overlapping of the evidence and the arguments, the two Judges to whom the two consolidated cases had been assigned sat together for most of the five-day trial. However, the record in the two consolidated cases has been kept separate, and nothing contained in this Opinion is intended to be a finding or conclusion concerning conditions at the Maryland Penitentiary.

tially all areas of the MHC.[5] Most of the basic facts were stipulated, and the evidence presented at the trial consisted mainly of the testimony of correctional and other experts called by the parties. The case has now been submitted on the stipulations, testimony produced at the trial and the numerous exhibits admitted in evidence. Findings of fact and conclusions of law under Rule 52(a), F.R.Civ.P., are embodied in this Opinion, whether or not expressly so characterized.

### The facts

Originally constructed some one hundred years ago, the MHC has had various additions and new facilities added from time to time since then. The basic structure is a typical 19th-Century stone institution. With the various additions and improvements over the years, the MHC is today designed to house 1100 inmates.[6] However, the institution had a population on March 10, 1978 of 1708 prisoners.

Prisoners in Maryland are classified as maximum security, medium security and minimum security. Typically, a medium security inmate is a person who has an intermediate length sentence or who has served a considerable part of a longer sentence without demonstrating a need for continued maximum security treatment. Many medium security inmates are transferred to minimum security institutions during the latter part of their terms. Approximately 30% of the inmates at the MHC are participating in academic or vocational programs in preparation for transition to minimum security status.

The main prison building is designed with a central structure controlling access to the two principal housing areas, namely the South and the West Wings. Each wing has a two-sided central core of cells, four tiers high, each tier having between forty and forty-nine individual cells. Each cell contains roughly forty square feet, and a great

many cells in the South and West Wings contain two inmates. Each cell in the South and West Wings contains, in addition to one or two bunks, a toilet, a sink and usually a shelf, locker or stool. Hot water is available in each cell. The wings share a single shower room with fifty shower heads, providing a ratio of one shower for every twenty-four men, based on present population.

Housing for inmates at the MHC is also available in six dormitory areas. These areas presently provide approximately fifty-five square feet per inmate bed space and eighty square feet per inmate, including recreation area.

Of the three principal inmate housing areas, the West Wing was opened in 1879, the South Wing in 1928 and H, I and J Dormitories in 1955. Other substantial additions to the physical plant include an Administration Annex in 1958, an industries compound opened in 1964, a new power plant in 1970, major improvements to the main dining room in 1974, a gymnasium in 1974 and a new hospital in 1975.

On the south side of the West Wing, the first two tiers, designated E–1 and E–2, are used to house inmates subject to administrative segregation. Prisoners who have violated institutional rules and regulations are confined here on a single-celled basis, following administrative hearings. Inmates in·administrative segregation are fed in their cells, are permitted to leave their cells for recreation for only one hour a day, and are otherwise more restricted in their activities than prisoners in the general population.

The dining facility, which is located in the main housing unit, seats 500 inmates at one time. It is therefore necessary to have three feeding shifts for each meal. Much of the kitchen equipment is antiquated.

The Special Confinement Area (the "SCA") consists of fifty individual cells in two rows of twenty-five each, which are

---

**5.** This tour took place on Friday, March 17, 1978, three days before the trial commenced, and lasted some 2½ hours.

**6.** The rated capacity of the institution under American Correctional Association standards is 1038.

back to back and share a common rear wall. The SCA was designed to house inmates who have psychological or psychiatric problems and who therefore must be separated from others in the general population. Inmates confined in the SCA remain in their cells approximately twenty-three hours a day and are allowed one hour exercise per day. Many of the cells have no beds but only mattresses. No hot water is available in the cells, but one of the fifty cells has been converted to a shower for use by the inmates. Prisoners confined here are fed in their cells.

The punitive segregation area consists of ten cells located beneath the main dining room in the basement of the institution. These cells are approximately forty square feet in size and have no running water. No beds are provided, only mattresses, and the only toilet facility is a mesh bar opening in the floor. Inmates are confined in this area as punishment for short periods of time.

Recreational facilities include a large indoor area in the South Wing, an outdoor recreation yard and a recently constructed gymnasium. The gymnasium building contains a full-size basketball court and bleachers and is often used as a movie theater. Television rooms with pool and table tennis tables are included within this building. There is also a library and an adjoining activities area where inmate organizations may hold meetings.

The main visiting room holds up to twenty-three inmates and sixty-nine visitors at one time. Plans are being prepared by the Division of Correction for converting in the near future the old auditorium in the main building into a large visiting hall, which would provide more space, better security and a more pleasant atmosphere for inmates and their visitors.

A new hospital accommodating twenty-eight patients has recently been opened. This facility includes several examining rooms, two dental offices, an X-ray room and various other storerooms and offices. Two licensed physicians are on the premises twenty hours a week per doctor, or a total of forty hours, and in the absence of doctors, nurses are on duty in the hospital. Two psychiatrists are also available on a consulting basis. Emergency cases are taken to the University Hospital in Baltimore.

Classification activities and offices are located in a building which adjoins the South Wing. The classification staff includes two supervisors, fourteen counselors and two full-time psychologists. These figures result in an average caseload per counselor of 120.

The MHC operates a school consisting of nine classrooms, each of which can accommodate twenty-five students. Classes operate at above capacity level on most days, and there is a waiting list of inmates who wish to participate in the academic program. The vocational education program at the MHC operates courses in welding, carpentry, shipfitting and office practices. The State Use Industries Unit operates auto tags, sign, mattress, paint, selling and woodworking shops manned by inmate labor. 302 vocational jobs are available at the MHC, and a maximum of 455 inmates can participate in educational programs at the institution, including basic education, intermediate education, high school education, special typing and college courses.

There has been a sharp increase in recent years in the number of inmates assigned to the Maryland Division of Correction. The Division's inmate population has increased from 4941 in the first quarter of 1972 to 8064 in the last quarter of 1976. The incidence of crimes committed in Maryland has shown a steady increase beginning in the mid-1960's and continuing to date.

### The applicable law

To be entitled to the relief they seek here, plaintiffs must show that they have been subjected to "cruel and unusual punishment" under the Eighth Amendment to the United States Constitution. Particularly in recent years, federal courts have taken an increasingly enlightened and progressive approach in finding that conditions of confinement in state penal institutions violate Eighth Amendment precepts. *Sostre v.*

*McGinnis,* 442 F.2d 178 (2d Cir. 1971), *cert. denied, sub nom. Sostre v. Oswald,* 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972); *Bundy v. Cannon,* 328 F.Supp. 165 (D.Md. 1971); *Landman v. Royster,* 354 F.Supp. 1302 (E.D.Va.1973); *see Collins v. Schoonfield,* 363 F.Supp. 1152, 1155–56 (D.Md. 1973). In *Estelle v. Gamble,* 429 U.S. 97, 102–3, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the Supreme Court said that the proscription embraced within the term "cruel and unusual punishment" was not to be considered as a static but rather as a progressive concept, covering any punishment of a prisoner which at the time was regarded as "incompatible with 'the evolving standards of decency that mark the progress of a maturing society.'" *See Hite v. Leeke,* 564 F.2d 670, 672 (4th Cir. 1977).

On the other hand, the Supreme Court and the Fourth Circuit in recent years have cautioned that a federal judge must act with restraint when questions pertaining to conditions in and the management of correctional institutions are presented. The problems of prison management are "complex and intractable" and are "not readily susceptible to resolution by decree." *Procunier v. Martinez,* 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974). Thus, federal courts have traditionally adopted "a broad hands-off attitude toward problems of prison administration." *Id.* at 404, 94 S.Ct. at 1807.

It is axiomatic that a lawfully convicted and sentenced state prisoner must necessarily suffer the loss of rights and privileges which ordinary citizens enjoy to the fullest extent. The Supreme Court has stated that " 'lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.'" *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974) (quoting from *Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948)). It has been pointed out that federal courts sit not to supervise prisons but to enforce the constitutional rights of all persons, including prisoners.

*Cruz v. Beto,* 405 U.S. 319, 321, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); *Meachum v. Fano,* 427 U.S. 215, 229, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). Moreover, where state penal institutions are involved, federal courts have a further reason for deferring to the appropriate prison authorities, *Procunier v. Martinez, supra* 416 U.S. at 405, 94 S.Ct. 1800, in view of "the strain placed upon the federal-state relationship" as a result of federal intervention in state prisons. *Battle v. Anderson,* 564 F.2d 388, 391 (10th Cir. 1977). Because of a lack of judicial expertise, prison officials must be accorded latitude in the administration of prison affairs, *Cruz v. Beto, supra* 405 U.S. at 321, 92 S.Ct. 1079, and their decisions "are entitled to considerable weight . . . ." *Ross v. Blackledge,* 477 F.2d 616, 618 (4th Cir. 1973). In *Sweet v. South Carolina Department of Corrections,* 529 F.2d 854, 859 (4th Cir. 1975), the Fourth Circuit summed up its review of the law in this area by stating:

> Courts are accordingly limited in their exercise of power in this area to deprivations which represent constitutional abuses and they cannot prohibit a given condition or treatment in prison management unless it reaches the level of an unconstitutional deprivation. It has been well said that "[C]ourts encounter numerous cases in which the acts or conditions under attack are clearly undesirable and are condemned by penologists, but the courts are powerless to act because the practices are not so abusive as to violate a constitutional right." Note, *Decency and Fairness: An Emerging Judicial Role in Prison Reform,* 72 Va.L.Rev. 841, 843 (1971).

In spite of these recent pronouncements by the Supreme Court and the Fourth Circuit, one cannot help but be struck by the number of occasions in recent years when federal courts have felt compelled to intervene in the internal affairs of prison management when conditions have been challenged as being unconstitutional because of overcrowding. *Battle v. Anderson, supra; McCray v. Sullivan,* 509 F.2d 1332 (5th Cir. 1975); *Finney v. Arkansas Board of Correc-*

*tion,* 505 F.2d 194 (8th Cir. 1974); *Chapman v. Rhodes,* 434 F.Supp. 1007 (S.D.Ohio 1977); *Palmigiano v. Garrahy,* 443 F.Supp. 956 (D.R.I.1977); *Anderson v. Redman,* 429 F.Supp. 1105 (D.Del.1977); *Mitchell v. Untreiner,* 421 F.Supp. 886 (N.D.Fla.1976); *Pugh v. Locke,* 406 F.Supp. 318 (M.D.Ala. 1976), *aff'd in part and rev'd in part, sub nom. Newman v. State of Alabama,* 559 F.2d 283 (5th Cir. 1977). When one reads between the lines of these opinions, it is apparent that state legislatures have been reluctant in these inflationary times to spend sufficient tax dollars to bring conditions in outdated prisons up to minimally acceptable standards. The crunch has become even more acute because of an increase in crime in recent years. At the same time that federal courts have been spelling out new constitutional minima based on this era's "maturing sensitivity"[7] as to prisoners' rights, the increased incidence of crime has resulted in more and more inmates being packed into obsolete prison facilities. Caught in the middle are state prison officials who must deal with the problems of overcrowding on a daily basis. Quite apparent from the record here is the fact that the Warden and other officials at the MHC have been conscientiously doing a highly commendable job with the resources that the Maryland State Legislature has given them. But it is equally apparent that the State Legislature has not given them as much as they need or would like to have.

■ It must, of course, be recognized that state legislatures are subjected to great pressures from many sides in allocating public funds for purposes which will benefit citizens of the state. Certainly, it would be a legitimate legislative prerogative to decide that more funds should be devoted to state programs designed to prevent crime than to make convicted felons more comfortable in the penal institutions to which they have been sent. But the Constitution sets a floor below which no state may go in providing the basic necessities for its prisoners. However heinous the crimes they may have committed, the plaintiffs in this case are human beings possessing rights recognized by the Constitution and by decisions of the Supreme Court. And there is no prisoners' lobby present in legislative halls to compete with powerful pressure groups seeking a share of the tax dollar. Again and again, it has been the lower federal courts which have felt compelled to intervene to assure that state officials are recognizing and implementing the basic constitutional rights of prisoners. This case is one of those in which a federal court reluctantly feels compelled to intervene in state prison affairs.

### Overcrowding and double-celling

■ From the totality of the evidence presented, this Court finds and concludes that the MHC is unconstitutionally overcrowded. The unconstitutional conditions at the MHC, in this Court's opinion, are caused solely by the defendants' practice of double-celling inmates in the main housing areas at the institution. Furthermore, for reasons discussed hereinafter, the SCA should be closed. When double-celling is discontinued and the SCA closed, this Court is satisfied that the unconstitutional overcrowding at the MHC will be eliminated and that other deficiencies described by witnesses in this case will no longer be of constitutional magnitude. Plaintiffs are therefore entitled to an injunction ordering the discontinuance of double-celling and the closing of the SCA. They are not entitled to injunctive relief designed to improve other conditions at the MHC.

As a starting point for consideration of the claim of unconstitutional overcrowding pressed in this case, this Court would note the age and architecture of the South and West Wings where all the double-celling occurs. The West Wing was built about 100 years ago, when prisoners were confined to their cells for major portions of their periods of confinement. Twentieth Century penology recognizes the psychological and physical harm caused by unremitting confinement. Although most prisoners

7. *Sostre v. McGinnis, supra* at 190; *Collins v. Schoonfield, supra* at 1156.

at the MHC are today free to move about outside their cells for large parts of the day, inmates not assigned a job nor enrolled in educational programs spend some sixteen hours a day in their cells. The South Wing was built fifty years ago, but its construction conformed to that of the West Wing. The cells in both wings were designed to house a single prisoner.

Over the years, State officials have conscientiously attempted to improve the antiquated physical facilities which housed the bulk of the prison population. Various physical improvements have been added from time to time, and new programs and services have been provided to meet the needs of the inmates. Measurable progress had been made until suddenly, in the early and mid-1970's, the prison population in Maryland jumped dramatically. In the five-year period between January 1, 1972 and December 31, 1976, the inmate population of the Division of Correction increased by 62%. In 1976 alone, there was an increase of 16%, the population having jumped from 6950 to 8064, or over 1100 additional prisoners in a single year.[8] To permit the MHC to handle its share of this sudden increase, prison officials ordered the doubling up of inmates at the institution in single cells containing only forty square feet. Much of the progress made in modernizing the antiquated facilities at the MHC to meet today's needs went down the drain because of this severe overcrowding.

Defendants concede, as they must, that overcrowding exists at the MHC. Every witness so testified. With improvements and additions, the MHC is designed to house 1100 inmates. Yet in March 1978, 1708 prisoners were confined in the institution. Defendants argue that the overcrowding has not reached constitutional proportions. This Court must disagree.

The many federal cases which have considered the problem of overcrowded conditions at state institutions establish no clearly delineated standards for determining at what point crowded prisons violate the Eighth Amendment. Certainly, convicted felons are not to be coddled and have no constitutional right to be housed in conditions suitable for a hotel or country club. *See Pugh v. Locke, supra* at 331. But it can hardly be gainsaid that at some point, the crowding of prisoners in outmoded facilities becomes incompatible with modern standards of decency and results in punishment beyond the limits of the Eighth Amendment.

The evidence here discloses that overcrowding at the MHC has adversely affected prisoners confined in that institution in various ways. The witnesses described both direct adverse effects on the prisoners themselves and indirect effects resulting from the inability of the prison staff to handle the needs of an ever-expanding prison population. The noise level at the institution, particularly in the four-tiered South and West Wings, is excessive. Expert testimony in this case indicates that the psychological effects of overcrowding include increased stress, anxiety and fear. Serious incident reports of violence and other major disciplinary infractions increased at the MHC from 231 in 1976 to 295 in 1977. There were 53 instances of attempted suicide at the institution in 1977. The SCA is almost always filled to capacity with prisoners suffering from psychological problems.

Extensive idleness is another by-product of overcrowding. Work, school or other programs designed as constructive outlets for inmates at the MHC were not intended to take care of a prison population of over 1700. One of defendants' own experts acknowledged that a major problem confronting the MHC was the enforced idleness of hundreds of prisoners who could be seen milling about in the yard, cell halls and dormitories or who merely remained in their cells during the day.

Considered separately, these deficiencies would not amount to a deprivation of constitutional magnitude. But weighed in

**8.** With these additional prisoners being crammed into existing State institutions, it is not surprising that in 1977 this Court was flooded with suits filed by State prisoners challenging as unconstitutional overcrowded conditions at various Maryland prisons.

their totality, these conditions at the MHC, all of which are directly related to overcrowding, result in the deprivation by defendants of rights guaranteed to plaintiffs by the Eighth Amendment.

■ This Court more specifically concludes that double-celling at the MHC, under the circumstances disclosed by the totality of the evidence in this case, is unconstitutional. The undesirability of double-celling is underscored by the expert testimony in this case, including that of defendants' own witnesses. One of defendants' witnesses termed double-celling "unfortunate" and "deplorable"; another called it a "bad practice". The evidence discloses that double-celling was never contemplated when the two wings were built, the cells in question having been intended for single occupancy when built fifty or one hundred years ago. Upper bunks were added when the recent crush of new prisoners required doubling up. Contemporary standards of human decency, see *Trop v. Dulles,* 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958), are offended by the practical necessities of living in such cramped quarters. When the inmate in the upper bunk is required to use the toilet facilities in the middle of the night, his cell mate lies in his bed, eighteen inches away. Minimum space to call one's own is a primary psychological necessity. *Battle v. Anderson,* 564 F.2d 388, 395 (10th Cir. 1977).

Double-celling increases the risk of sexual attacks by one prisoner on another and decreases the ability of prison guards to protect younger and weaker inmates from such homosexual assaults. Some of the testimony in *Withers v. Levine,* 449 F.Supp. 473 (D.Md.1978), a case recently tried in this Court, was likewise made a part of the record in this case. That testimony graphically illustrates that a younger prisoner at the MHC is at the mercy of an older and stronger cell mate when locked in a double cell at night. In a very recent opinion filed on April 21, 1978 in the *Withers* case, Judge Young, in granting declaratory and injunctive relief, ordered state officials to promulgate and implement written procedures for the safe initial housing assignment of arriving inmates (*Id.* at 478). Among the options which Judge Young directed officials of the MHC to consider was the single celling of more incoming inmates.

The relief granted in this case will go beyond that ordered by Judge Young in *Withers.* The defendants will be required to discontinue double-celling for *all* inmates, both the newly arrived and those previously in custody. This Court is satisfied that the elimination of this practice will, *inter alia,* reduce the threat of homosexual assault at the MHC and concomitantly the constant fear of such assault, which amounts to an undue burden placed upon prisoners at the institution. *See Woodhous v. Commonwealth of Virginia,* 487 F.2d 889, 890 (4th Cir. 1973); *Penn v. Oliver,* 351 F.Supp. 1292, 1294 (E.D.Va. 1972).

Approximately 960 inmates at the MHC are double-celled. Reducing the inmate population by eliminating double-celling will achieve the following beneficial results:

(1) Idleness will be decreased. A larger percentage of the prison population will be able to engage in educational, vocational and other constructive outlets.

(2) Athletic, recreational and hygienic facilities will become more readily available to inmates. If double-celling is eliminated in the West Wing, the present ratio of twenty-four men per showerhead will be reduced to fourteen men per shower head, a much more acceptable ratio.

(3) Excessive noise levels will be reduced.

(4) The ratio of prison staff to number of inmates will be increased. Better security will be provided by prison guards, who will be better able to control assaults, misbehavior and the distribution of contraband. Prisoners will enjoy increased access to counselors, and classification procedures should improve with fewer inmates assigned to classification officers.

(5) The number of sittings for meals will be reduced from three per meal to two per meal. At the present time, there are nine servings of meals every day. The elimina-

tion of double-celling will reduce this number to six. More time can then be devoted to food preparation and to sanitation in the kitchen and dining area. Fewer sittings will decrease security problems when inmates are going back and forth to their meals.

In claiming that double-celling is constitutionally permissible in this case, defendants rely on *Hite v. Leeke, supra. See also Crowe v. Leeke,* 540 F.2d 740 (4th Cir. 1976). In *Hite,* the Fourth Circuit held that the dual assignment of two prisoners to a room sixty-five feet square was not *per se* unconstitutional. But *Hite* is not controlling here, because of the markedly different facts involved in that case. Plaintiff there had challenged conditions in a new South Carolina correctional institution, completed in 1975 at a cost of approximately $12 million. The Court was careful to point out in *Hite* that the prisoners in that institution enjoyed a wide freedom of movement and that the alleged overcrowding was not part of larger problems which might have given rise to what has been·described as the "totality of conditions" approach. 564 F.2d at 673.

In this case, portions of the institution are 100 years old, and the cell area involved is only forty square feet. Furthermore, this Court has employed the "totality of conditions" approach in finding unconstitutional overcrowding in this case. Considering the double-celling challenged in this case in the light of all the other existing conditions at the MHC, this Court is satisfied that *Hite v. Leeke* does not require a different result. The other deficiencies described in this opinion and caused by unconstitutional overcrowding at the MHC were not found to be present in the *Hite* case.

On the record here, this Court concludes that discontinuation of the practice of double-celling at the MHC will eliminate the unconstitutional overcrowding that now exists at that institution. Not only will the number of inmates be reduced, but the to-tality of other conditions will also be thereby improved to the extent that confinement in the MHC will no longer be constitutional-. ly offensive.

### The Special Confinement Area

The Special Confinement Area (the "SCA") is designed to house inmates who have psychological or psychiatric problems. Conditions of confinement are much more onerous here than anywhere else in the institution, except for the punitive segregation area. However, inmates are placed in punitive segregation as punishment; those in the SCA are not. Inmates are confined in punitive segregation for only short periods of time, while those in the SCA stay, on the average, six to eight months and even longer.[9] There is no hot water in the cells, and many cells contain no beds or toilets. Only one shower exists for forty-nine prisoners. Inmates are confined in these cells for twenty-three hours a day and fed in their cells. Only one correctional officer is assigned to the entire area, and he has the responsibility for security, supervision and feeding of all forty-nine inmates.

On the record here, this Court concludes that conditions in the SCA, in their totality, do not meet constitutional standards and that the SCA should be discontinued as soon as arrangements can be made to transfer the inmates elsewhere. Many of the persons confined in these cells are concededly psychotic, but are housed at the MHC because State mental institutions will not accept them. However, no psychiatric treatment is afforded these mentally ill prisoners; they are merely warehoused in the SCA. *See Bowring v. Godwin,* 551 F.2d 44, 47 (4th Cir. 1977); *McCray v. Burrell,* 516 F.2d 357, 367–69 (4th Cir. 1975) (*en banc*), *cert. dismissed,* 426 U.S. 471, 96 S.Ct. 2640, 48 L.Ed.2d 788 (1976). Others who are not psychotic but who have emotional problems are confined in the SCA, not as punishment but because of aberrant behavior. Yet these individuals are punished much more

---

**9.** The record indicates that the SCA is usually fully occupied, up to its limit of forty-nine inmates.

severely by being confined in the SCA than are those confined in the administrative segregation area, even though the latter have intentionally broken prison rules.

■ The actively psychotic prisoners and those others who need immediate treatment should be removed from the MHC and transferred to an appropriate State mental institution. The Clifton T. Perkins Hospital Center, which is under the jurisdiction of the State Department of Health and Mental Hygiene, is specifically designed for the hospitalization of inmates of State penal institutions who become mentally ill and require such hospitalization. *See Maryland Manual,* 1977–1978, p. 168. If institutions under the jurisdiction of that Department refuse to accept these prisoners, this Court is prepared to join that State agency as a defendant in this case and order the transfer. Others should be transferred to the administrative segregation area, if they are not mentally ill and if, after adjustment hearings, it is found that their behavior has resulted in a violation of prison rules. *See Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Bundy v. Cannon,* 328 F.Supp. 165 (D.Md.1971).

### The dormitories

■ Although this Court is satisfied that double-celling as it exists in the MHC is unconstitutional, plaintiffs have not met their burden of proving that the number of inmates housed in each of the dormitories should be reduced. C and D Dormitories house eighty-six and eighty-eight inmates respectively, while H, I and J Dormitories, which are much larger in area, house approximately 106 each.[10] Each of the dormitories provides approximately fifty-five square feet per inmate bed space and eighty square feet per inmate, including recreation area. In addition, there are the adjacent toilet and shower areas, which provide even more space for the inmates confined in the dormitories. By way of contrast, the forty square foot double cells include that space occupied by toilets.

The testimony and the Court's inspection of these areas indicate that the degree of crowding in the dormitories is nowhere near as severe as in the institution's forty square foot cells which are occupied by two inmates. The dormitories themselves are kept reasonably clean, and sanitation in the shower and toilet areas is adequate. Although more space might be desirable, the dormitories meet constitutional requirements, and this Court will not order a reduction in the number of prisoners confined in any of the MHC's dormitories.

### Other conditions

Plaintiffs also ask this Court to intervene in the management of the MHC in other areas and to require the defendants to correct many other alleged deficiencies. But this Court is satisfied that once the overcrowded conditions at the MHC are corrected by the elimination of double-celling, these other inadequacies will not require the intervention of this Court. Indeed, in and of themselves, these other conditions and programs are not constitutionally deficient. It is only when they are considered in their totality together with the double-celling that exists throughout the institution that this Court finds and concludes that overcrowding at the MHC fails to meet constitutional standards.

In *Newman v. State of Alabama, supra,* cited with approval by the Fourth Circuit in *Hite v. Leeke, supra* at 672, and more recently by the Fourth Circuit in *Bolding v. Holshouser,* 575 F.2d 461 (4th Cir. 1978), the Fifth Circuit said the following (at page 291):

> If the State furnishes its prisoners with reasonably adequate food, clothing, shelter, sanitation, medical care and personal safety, so as to avoid the imposition of cruel and unusual punishment, that ends its obligations under Amendment Eight.

■ What the State of Maryland furnishes its prisoners in this regard at the MHC, if considered separately and without

---

**10.** Conditions in H–Annex, which houses minimum security inmates, are obviously superior to those elsewhere in the institution and clearly meet constitutional requirements.

relation to the overcrowded conditions at the institution, is reasonably adequate. Specifically, the food provided is sufficiently nutritious and served in sufficient quantities to be constitutionally adequate. Home-cooked meals served in a quiet atmosphere are hardly provided but rather typical institutional food for 500 persons at each sitting. The witnesses who testified concerning the cleanliness of the kitchen areas, the use of outmoded equipment and utensils and the temperature of the food at the time it was served were more concerned with ideal institutional practices rather than with constitutional minima, which are the only concern of this Court.

Adequate heat, light and ventilation are likewise provided at the MHC. Sanitation and rodent control are not constitutionally offensive and substandard. The recreational and athletic facilities are adequate. Staffing at the MHC is presently sufficient to meet the basic needs of the prison population and will be even more adequate when overcrowded conditions are eliminated. Classification and parole and release procedures also meet constitutional standards. Much of the testimony presented by plaintiffs' experts was devoted to minute and trivial details, including, for example, the wattage of electric light bulbs in cells and the precise temperature of the hot food served to inmates during meals. However undesirable the described deficiencies might be, they hardly amount to abusive practices which violate the plaintiffs' constitutional rights.

Medical care and psychological services (other than confinement in the SCA) are likewise sufficient. The new hospital and the manner in which it is manned by doctors and nurses adequately meet constitutional standards. There are two doctors on the premises twenty hours per week per doctor, and the institution employs eleven registered nurses. The physical facilities are modern and well suited to provide ambulatory and infirmary care for inmates. Emergency cases are taken by ambulance to the University Hospital in Baltimore. Although improvements in the staffing and equipping of the hospital would be desira-

ble, as would a reorganization of the medical records system, these deficiencies are not of constitutional magnitude. Much of the evidence presented was directed to the fact that on too many occasions rather than on two few inmates were taken to the University Hospital when the treatment sought did not require hospitalization. Concededly, when inmates are received at the Hospital, the treatment they then receive meets constitutional standards.

The Supreme Court has held that where medical care in a state penal institutional is challenged, liability under the Eighth Amendment and 42 U.S.C. § 1983 will arise only on proof of deliberate indifference by state officials to prisoners' serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The evidence in this case falls far short of meeting this standard. Proof of isolated instances when a prisoner died in an ambulance or shortly after reaching the University Hospital hardly amounts to deliberate indifference on the part of the defendants. Most of these incidents involved cardiac patients, and the proof does not indicate that their lives would have been saved had more sophisticated measures been taken. The evidence here is not sufficient for the entry of an injunction which would require defendants to provide a fully equipped and staffed hospital to take care of any and all medical contingencies.

In the visitors' area, the elimination of overcrowding will correct existing deficiencies. Furthermore, plans are under way at the present time to move the visitors' area to another location to provide more room for both inmates and their visitors. These changes are expected to be completed in the very near future and will make the visiting area more than adequate to meet constitutional requirements.

Eliminating overcrowding will also make educational and vocational programs available for more of the inmate population. The expert witnesses in this case found little fault with the educational programs offered and with the opportunities afforded in-

mates for working at different jobs. There is at present impartial access for these various rehabilitative programs. The problem that now exists is that present facilities do not permit a very large percentage of inmates either to go to school or to engage in vocational programs. Reduction of the prison population will correct these deficiencies and eliminate much of the present idleness at the MHC, with expected improvements in morale and disciplinary problems.

■ Plaintiffs have further argued in this case that the rehabilitative programs and services of the MHC, when considered in their entirety, fail to meet constitutional requirements. But as noted, the standard to be applied here is "cruel and unusual punishment" under the Eighth Amendment. When such a standard has been applied in cases involving alleged deficiencies in rehabilitative programs, courts have consistently held that a prisoner has no constitutionally protected right to rehabilitation. *See Newman v. State of Alabama, supra* at 291; *Holt v. Sarver*, 309 F.Supp. 362, 379 (E.D. Ark.1970), *aff'd*, 442 F.2d 304 (8th Cir. 1971); *Lunsford v. Reynolds*, 376 F.Supp. 526, 528 (W.D.Va.1974); and *United States v. Wyandotte County*, 343 F.Supp. 1189, 1202 (D.Kan.1972), *rev'd on other grounds*, 480 F.2d 969 (10th Cir.), *cert. denied*, 414 U.S. 1068, 94 S.Ct. 577, 38 L.Ed.2d 473 (1973). In *Newman v. State of Alabama*, the Fifth Circuit specifically held that the failure of prison authorities to provide a rehabilitation program did not constitute cruel and unusual punishment. 559 F.2d at 291.[11] What penological experts, or even this Court, might feel to be highly desirable is not the standard to be applied in a case brought under the Eight Amendment.

■ Plaintiffs have also asked this Court to order the closing of the punitive segregation area. However, the evidence

indicates that this area is used very infrequently. Furthermore, inmates are confined in these cells for only a short period of time, no more than four or five hours as a cooling-off period for a prisoner who has lost control of himself and must be isolated until he calms down. Indeed, none of the experts who visited the MHC found a single inmate confined in the punitive segregation area at the time of his visit, nor did the Court when it toured the institution on March 17, 1978. Segregated or solitary confinement does not in itself violate the Constitution, and may be appropriately employed for short periods of time to control recalcitrant prisoners. *Sweet v. South Carolina Department of Corrections, supra* at 858, n. 1; *Collins v. Schoonfield*, 363 F.Supp. 1152, 1166–68 (D.Md.1973). In this case, the evidence discloses that conditions in the punitive segregation cells at the MHC would not meet constitutional minima if inmates were confined there for extended periods of time. However, these conditions are constitutionally permissible for short periods of confinement, and the cells in question are used in this manner by prison officials at the MHC.

■ The evidence here likewise does not support a constitutional challenge to conditions of administrative segregation at the MHC. Indeed, in many ways, inmates in administrative segregation, who are single-celled, endure less onerous conditions than those in the general population who are double-celled. Moreover, the proof in this case has not shown that disciplinary procedures at the MHC do not meet the requirements of *Bundy v. Cannon, supra*.

In support of their contentions in this case, plaintiffs rely on a number of different publications issued by the American Correctional Association (the "ACA") and other similar organizations.[12] Plaintiffs

11. In both *Hite v. Leeke, supra*, and *Bolding v. Holshouser, supra*, the Fourth Circuit cited the *Newman* decision with approval.

12. Included are the ACA's *Manual of Correctional Standards* (1966 Ed.); the ACA's *Manual of Standards for Adult Correctional Institutions*

(1977 Ed.); *Standards for Health Services in Correctional Institutions* (1976 Ed.) of the American Public Health Association; and *Report of the National Advisory Commission on Criminal Standards and Goals* (1973 Ed.).

point out that many of the standards set forth in those publications have not been met by the MHC. As sensible and desirable as are the many suggestions of these organizations, they do not amount to constitutional minima. The exhibits in question are undoubtedly relevant to the constitutional issues in this case, and are entitled to different degrees of weight, depending upon the extent of the difference between conditions at the MHC and the suggested standard. However, in this case, the issue is whether particular conditions at the MHC constitute cruel and unusual punishment under the Eighth Amendment, not whether they meet standards adopted by a group of penologists or other experts in the field. A federal judge should not exercise his judicial powers and intervene in the operation of state prisons for the attainment of what the judge "might like to see accomplished in the way of ideal prison conditions." *Newman v. State of Alabama, supra* at 287; cited with approval in *Hite v. Leeke, supra* at 672, and in *Bolding v. Holshouser, supra.* In particular, this Court does not conclude that confinement of a single inmate in a forty square foot cell at the MHC is unconstitutional, even though the ACA recommends sixty square feet of space for each inmate in a single cell.

In sum, this Court is satisfied that other conditions at the MHC will satisfy constitutional standards once overcrowding is eliminated.

### Relief

The final question presented in this case concerns the type of injunctive relief to be ordered by this Court to correct the constitutional deficiencies found to exist at the MHC. No ready solution to this complex problem exists. On the one hand, this Court is satisfied that the practice of double-celling and the overcrowded conditions at the MHC must cease as soon as the changes can reasonably be accomplished. On the other hand, it must be recognized that the public is entitled to be protected from the premature release of convicted felons. These two inconsistent objectives

meet head on in this case. Quite obviously, this Court cannot order the overnight reduction of the institution's prison population by hundreds of inmates, nor require that the SCA be closed tomorrow. Yet every day that overcrowding continues and the SCA remains open, the plaintiffs and their class will be enduring punishment proscribed by the Eighth Amendment.

Recognizing that overcrowding and other deficient conditions exist in its institutions, Maryland correctional officials have in good faith prepared plans for modernizing state prison facilities, known as the Maryland Master Plan, Phases I and II. These Plans provide, *inter alia*, for the construction within the next four years of a new reception center, a new medium security prison and other facilities designed to reduce overcrowding in and modernize Maryland penal institutions. But future implementation of defendants' Master Plans will not be enough to meet the needs of plaintiffs and their class. Although large increases in the number of prison beds available in State prisons have been projected by Maryland correctional officials and some of the construction is nearing completion, it will not be until 1982 that all the new facilities are scheduled for completion. But plaintiffs and the members of their class cannot wait for another four years. Reduction of overcrowding at the MHC must start at once and must be accomplished in a matter of months, not years.

█ No damages have been claimed by the plaintiffs in this case, and the decree to be entered by the Court should therefore provide only for injunctive and declaratory relief. Had plaintiffs sought damages here, such a recovery would have been denied. The evidence clearly establishes that the actions challenged in this case were taken by defendants in the good-faith fulfillment of their responsibilities and within the bounds of reason under all the circumstances. *Wood v. Strickland*, 420 U.S. 308, 321, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). The facts here indicate that the constitutional principles involved had not been so clearly established at the time of infringement that

the defendants could be charged with knowledge that their conduct was a violation of the constitutional rights of plaintiffs and the members of their class. Accordingly, on the present record, the defendants are immune from liability for damages under § 1983. *Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978).

Counsel should meet promptly and undertake to devise a plan for accomplishing at an early date the objectives which this Court has found are constitutionally required. Such a plan should provide for the reduction in stages of the prison population of the MHC. Plaintiffs have specifically requested that this Court place a top limit of 912 as the number of inmates who can be constitutionally confined in the MHC. No such rigid standard will be incorporated in the final decree. So long as double-celling is eliminated and the prison population reduced by a number of inmates equal to the number of double cells now existing, unconstitutional overcrowding will have been eliminated at the MHC.

This Court would note that a Memorandum and Decree was entered by Judge Kaufman on November 23, 1977 in *Duvall v. Lee,* Civil No. K–76–1255, a pending case involving overcrowding at the Baltimore City Jail. Pursuant to the Partial Consent Decree approved in that case, overcrowding at the Baltimore City Jail is being reduced in stages under an agreed timetable. However, inmates have been transferred from the City Jail to new facilities which may likewise have to be used to reduce overcrowding at the MHC (and also at the Maryland Penitentiary).[13] Quite obviously, overcrowding in Maryland prisons is a State-wide problem. Resolution of the problem demands a coordinated approach by counsel in all three of the cases now pending in this Court.

[15] In devising a plan for correcting unconstitutional conditions at the MHC, counsel in this case should consider the measures agreed upon in the Baltimore City Jail case, as well as suggestions made herein by this Court. Whatever is eventually done, it is obvious that immediate additional funding for various state agencies will be required to reduce the population at the MHC to constitutionally permissible limits as promptly as possible. In particular, counsel should consider the following: the transfer of psychotic and mentally ill inmates to State mental hospitals; improvements to the SCA to permit the housing of general population inmates there on a single-celled basis; the reclassification of inmates in the MHC and, where warranted, the transfer of inmates to half-way houses, community treatment centers, county jails, correctional camps and minimum security institutions; where warranted, acceleration of the release of inmates on parole, work-release or otherwise; the hiring of additional personnel to screen and reclassify prisoners for transfer to other institutions, for parole or for release; the hiring of additional personnel by the Maryland Parole Commission to expedite the holding of parole hearings; the acceleration of planned construction programs to make new facilities available at the earliest possible date; and the fixing of a cut-off date for the acceptance of new prisoners at the MHC. A decision concerning the alternatives to be selected for accomplishing the objectives outlined should be made in the first instance by responsible state officials and, if reasonable, should be approved by counsel for the plaintiffs.

When counsel have agreed upon an appropriate plan, it should be submitted to the Court for consideration and approval. A conference with counsel will be scheduled within thirty days. If no agreement can be reached as to the measures to be adopted and the time for their implementation, this Court will itself determine the injunctive and declaratory relief to be entered, including, as a last resort, the drastic and un-

---

**13.** In an opinion filed today, Judge Blair has found that overcrowding also exists at the Maryland Penitentiary. The undersigned Judge has had an opportunity to review that opinion and would agree completely with the conclusions reached therein by Judge Blair.

wanted measure of ordering the release of certain prisoners.[14]

The Court would like to thank all counsel for their courtesy and cooperation throughout these proceedings and for the competent manner in which this case was presented.

**14.** A ruling is reserved at this time on plaintiffs' application for an award of attorney's fees. *See Finney v. Hutto*, 548 F.2d 740 (8th Cir. 1977), *cert. granted*, 434 U.S. 901, 98 S.Ct. 295, 54 L.Ed.2d 187 (1977).