**John DOE**

v.

**Robert LALLY, et al.**

**Civ. No. Y–74–63.**

United States District Court,
D. Maryland.

March 5, 1979.

---

1340

E. Dale Adkins, III, Baltimore, Md., for plaintiff.

John P. Stafford, Jr., Asst. Atty. Gen., Baltimore, Md., for defendants.

JOSEPH H. YOUNG, District Judge.

Plaintiff John Doe began this suit under 42 U.S.C. § 1983 seeking damages as a result of a homosexual rape suffered while an inmate at the Maryland Reception, Diagnostic and Classification Center ("MRDCC") on March 29, 1973. The complaint was later amended to include a claim for injunctive and declaratory relief. Plaintiff had been brought to the MRDCC on March 21, 1973 for classification following conviction of assault with intent to harm. Both the Maryland State Penitentiary ("Penitentiary") and the MRDCC are located in the same compound in Baltimore, but their respective facilities and inmates are supposed to remain separate. Plaintiff states that he was attacked during the course of a widespread riot in the Penitentiary which spilled over into the cell blocks of the MRDCC. In his initial complaint, plaintiff alleged that his sexual molestation was the immediate result of defendants' failure to maintain proper security and control throughout the Penitentiary at all times. Plaintiff named the following parties as defendants: Robert Lally, Maryland Secretary of Public Safety; Gordon C. Kamka, Superintendent of the MRDCC; James Jordan, the Maryland Commissioner of Corrections; and Gerald H. McClellan, the Warden at the Maryland Penitentiary.

This Court denied defendants' motion to dismiss plaintiff's complaint on December 11, 1974. In the meantime, in April, 1976,

another inmate of the MRDCC, Nathan M. Nance, moved to intervene as a party plaintiff asserting precisely the same claims as plaintiff Doe as to MRDCC conditions and the commingling of Diagnostic Center inmates with the Penitentiary population. *See* F.R.Civ.P. 24(b). Plaintiff Nance also moved to certify the proceeding as a class action. While this Court permitted Nance to intervene on January 7, 1977 it initially denied the class certification, subject to later reconsideration. Upon subsequent reconsideration and in light of the fact that several of the issues in the case were likely to become mooted, this Court granted plaintiff-intervenor's motion for class certification on October 11, 1977 pursuant to F.R. Civ.P. 23(b)(2) for the limited purpose of preserving the issues from mootness. On February 25, 1977, however, plaintiff-intervenor Nance escaped from the Southern Maryland Correctional Camp Center, and is still in an escape status, his whereabouts unknown.

Defendants, represented by the Attorney General's Office of Maryland, have now moved to dismiss both that portion of plaintiff Doe's amended complaint pertaining to injunctive and declaratory relief and the order certifying the class action. They claimed that since Nance has escaped, the class action should be decertified, and without such certification, plaintiff Doe's action for injunctive and declaratory relief has become mooted because Doe no longer resides at the MRDCC.

## I. THE MOTION AS TO PLAINTIFF DOE

■ Plaintiff Doe's original complaint sought only money damages as a result of the alleged pederasty and other abuses to which he was subjected during the course of a riot in the Maryland State Penitentiary on March 29, 1973. In his amended complaint, filed after he had been transferred from the MRDCC, Doe asked for certain declaratory and injunctive relief in light of what he maintained was an atmosphere of pervasive violence and danger to the inmates at the MRDCC which had created a pattern, the consequence of which was the mass riot during which plaintiff Doe was raped.

Defendant would dismiss this portion of plaintiff's amended complaint on two grounds: (1) at the time of filing the amended complaint, Doe was no longer being subjected to the conditions from which he sought declaratory and injunctive relief, and (2) the request for such relief was moot because Doe's case was not at that time, nor is it now, certified as a class action. In support of their position, defendants cite *Weinstein v. Bradford,* 423 U.S. 147, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975); *Sosna v. Iowa,* 419 U.S. 393, 399–402, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975); *DeFunis v. Odegaard,* 416 U.S. 312, 319–20, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974); *Super Tire Engineering Co. v. McCorkle,* 416 U.S. 115, 121–22, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974); and *Tawwab v. Metz,* 554 F.2d 22 (2d Cir. 1977).

Defendants' arguments must be rejected. In granting plaintiff Nance's motion to intervene in this civil rights case, the Court recognized the essential similarity of the claims being raised by the two petitioners. On the same day that it granted plaintiff Nance leave to intervene, the Court also denied his request for class certification, subject to later reconsideration should the facts warrant it. Class certification was in fact granted upon such later consideration.

It now appears that plaintiff Nance has escaped from custody, and for these reasons, considered in more detail below, defendants would also seek to have the class action decertified. Acceptance of the logic of defendants' theories would have the unwarranted effect of preventing litigation of the equitable issues raised by both plaintiffs. Inmates at the MRDCC were, and still are, confined for short periods of time prior to being transferred to other penal institutions. Plaintiff Doe was at the MRDCC for some fifteen days, from March 21 to April 5, 1973. The rape occurred on March 29, 1973. Unless courts adopt a liberal attitude towards mootness aspects of civil rights claims brought in connection with alleged deprivations occurring at temporary prison facilities, such claims will con-

tinue to recur and escape adjudication. As the Supreme Court said in *Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911), such deprivations will be "capable of repetition, yet evade review" by the courts. Plaintiff Doe's *original* complaint was also filed *after* he had left the MRDCC, and as far as this Court is concerned, a plaintiff's essential right to relief pursuant to civil rights claims should not depend on his remaining within the institution where the deprivation occurred. Otherwise, defendants in such actions could simply defeat a court's jurisdiction in every instance by transferring inmates from institution to institution.

Thus, claims for money damages are clearly not mooted by a transfer or release from confinement, or by alleviation of the alleged violation. *See Mawhinney v. Henderson,* 542 F.2d 1 (2d Cir. 1976); *United States ex rel. Jones v. Rundle,* 453 F.2d 147 (3d Cir. 1971). In *Inmates v. Owens,* 561 F.2d 560 (4th Cir. 1977), the Fourth Circuit decided that claims for injunctive relief become mooted whenever the prisoner is no longer subject to the alleged deprivation, unless the suit has been filed and certified as a class action.

## II. THE MOTION AS TO PLAINTIFF NANCE

The ultimate resolution of the motion to dismiss parts of the Doe complaint is conceptually intertwined with defendants' motion to dismiss plaintiff Nance as intervenor and to decertify the class action. To grant defendants' motion would be to confine the scope of any hearing merely to damages claimed by plaintiff Doe.

 When a court decides to certify an action as a class action, it must be able to distinguish or define membership of the class at the outset. *See, e. g., D & A Motors v. General Motors Corp.,* 19 F.R.D. 365, 366, 22 F.R.Serv. 23a. 11, Case 1 (S.D. N.Y.1956); 3B *Moore's Federal Practice* ¶ 23.04[1], at 23–114 (2d ed. 1978). The representative plaintiff or plaintiffs may maintain a class action only if the requirements of Rule 23(a) and (b) [1] of the Federal Rules of Civil Procedure are satisfied at the time of certification. Since plaintiff Nance had been permitted to intervene in plaintiff Doe's original suit, it would appear that for

---

1. The text of F.R.Civ.P. 23(a) and (b) reads as follows:

### Rule 23.
### CLASS ACTIONS

(a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

(b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class which would as a prac-

tical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

the purposes of class certification, either named plaintiff could serve as a proper class representative. Once an affirmative determination has been made, however, the action should be viewed as having been a class action from the date of commencement and not merely the determination date. 3B *Moore's Federal Practice* ¶ 23.50, at 23–434 (2d ed. 1978). As the court in *Philadelphia Electric Co. v. Anaconda American Brass Co.,* 42 F.R.D. 324, 326, 11 F.R.Serv.2d 23.1, Case 1 (E.D.Pa.1967) noted:

> "The use of the word 'maintained' in 23(c)(1) is some indication that the court is expected to determine *what the lawsuit has always been, not what it is about to become."* (Emphasis added).

In the instant case, certification came after plaintiff Doe's amended complaint and at the request of intervenor Nance who is now unavailable for trial. At the time Nance filed his complaint for declaratory and injunctive relief, he was still confined in the MRDCC. Since his complaint was subsequently certified as a class action, it cannot be mooted due to any later transfer to another institution. *Inmates v. Owens, supra.* The issue which does arise, however, is whether a representative class exists in light of the fact that its original plaintiff-representative, Nance, is unavailable to participate in the trial. Without Nance, say defendants, the action must be decertified as a class action, and without a class action, plaintiff Doe is limited to recovering only damages under the holding in *Mawhinney v. Henderson, supra.* While defendants' logic may be straightforward, it is not compelling.

The courts have frequently faced the recurring problem of mootness in connection with class action suits as well as the question of whether the original plaintiff remains a proper representative. With regard to mootness, the Supreme Court made it clear in *Sosna v. Iowa,* 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975), that a representative party must have standing at

the time the action is begun *and* when it is certified under Rule 23(c)(1). Footnote 11 of the opinion, cited by defendants, suggests that in cases where the time frame prior to mootness arising appears narrow, the district court may even make its certification after the plaintiff's claim is moot:

> "There may be cases in which the controversy involving the named plaintiffs is such that it becomes moot as to them before the district court can reasonably be expected to rule on a certification motion. In such instances, whether the certification can be said to 'relate back' to the filing of the complaint may depend upon the circumstances of the particular case and especially the reality of the claim that otherwise the issue would evade review." 419 U.S. at 402 n.11, 95 S.Ct. at 559.

In *Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), the Supreme Court further liberalized the mootness requirements in class action cases by holding that where plaintiff attacked the constitutionality of state rules on pretrial detention in a class action but it later became apparent that at certification plaintiff was already convicted and no longer detained under the statute, the action was not moot as it fell within the exception for "rapidly mooting" cases referred to in *Sosna, supra.* 3B *Moore's Federal Practice* ¶ 23.04[2], at 23–133 (2d ed. 1978).[2]

■ Recent cases have demonstrated that the Supreme Court favors a liberal approach *both* with regard to mootness and an individual plaintiff's representative capacity. Even though an individual original plaintiff may cease to remain a proper representative, *see Willard v. Ciccone,* 507 F.2d 1 (8th Cir. 1974) (plaintiff's action challenging conditions at correctional institution mooted by transfer to another institution; court held he was no longer a proper representative of present inmates and affirmed dismissal as to class claims as well), this

---

**2.** Note that the Supreme Court's reasoning in these cases requires certification as a general rule in order to avoid mootness. See a third 1975 opinion to this effect, *Board of School*

*Commissioners v. Jacobs,* 420 U.S. 128, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975). 3B *Moore's Federal Practice* ¶ 23.04[2], at 23–132 (2d ed. 1978).

fact does not automatically mean that the class action necessarily fails. *Franks v. Bowman Transportation, Inc.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976), held that even though the plaintiff, a black truck driver, had been discharged for cause, there was still a current controversy between the class of black workers, the employer, and the union. The *Sosna* court had, after all, made the following pronouncement:

"When the District Court certified the propriety of the class action, the class of unnamed persons described in the certification acquired a legal status separate from the interest asserted by [the named representative]." 419 U.S. 393, 399, 95 S.Ct. at 557, 42 L.Ed.2d at 540.[3]

■ Although plaintiff-intervenor Nance may not in fact be present in this action, the Court must not overlook the fact that the interests of others than those of plaintiff Nance are at stake in this action. A district court has "broad discretion in deter-

mining whether the action may be maintained as a class action," 3B *Moore's Federal Practice* ¶ 23.50 at 23–437, and so long as the court considers the proper criteria, it is permitted to exercise such discretion. *Wright v. Stone Container Corp.,* 524 F.2d 1058 (8th Cir. 1975) (affirming denial of class treatment); *Monarch Asphalt Sales Co. v. Wilshire Oil Co. of Texas,* 511 F.2d 1073 (10th Cir. 1975) (affirming class definition).

■ At the time of certification, plaintiff Doe was a proper representative of the class he sought to represent even though plaintiff Nance was no longer in custody. Defendants themselves cite with emphasis the appropriate language from *Sosna, supra,* on this point:

"A litigant must be a member of the class which he or she seeks to represent at the time the class action is certified by the district court." 419 U.S. at 403, 95 S.Ct. at 559.

---

**3.** *Moore,* however, qualifies this result with the following analysis:

"Under these liberalizing principles, the subsequent mooting of the individual claim is not irrelevant, however. In *Kremens v. Bartley,* [431 U.S. 119, 97 S.Ct. 1709, 52 L.Ed.2d 184 (1977),] the Court points out '. . . we have never adopted a flat rule that the mere fact of certification of a class by the District Court was sufficient to require us to decide the merits of the claims of the unnamed class members when those of the named parties had become moot,' and went on to remand a class case for reexamination by the trial court where subsequent legislation and administrative regulation had mooted both the representative's claim and also the claims of a large part of the class originally certified. And in *East Texas Motor Freight System, Inc. v. Rodriguez,* [431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977),] the Court distinguished *Franks v. Bowman Transportation, Inc.,* [424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976).] Whereas *Franks* allowed a certified class action to continue after a finding that the representative had been properly discharged, *Rodriguez* held that where the plaintiff made no demand for the certification, the subsequent trial and failure of his individual promotion claim on the merits eliminated him from class membership, and the Court of Appeals could not reinstate the class claim.

"In summary, as to mootness aspects of standing, the Supreme Court has devised a realistic series of tests to determine whether a live controversy continues to exist between the class and its opponent. As to other aspects of standing doctrines, such as injury in fact, comparable principles define the requisite causation and injury to the group and to the representative. It bears repeating that, assuming there is sufficient standing to meet tests of justiciability, the named representative must also have Rule 23 standing himself, *i. e.,* satisfy all the prerequisites of Rule 23(a), most importantly that he be an adequate representative of the class he purports to represent." 3B *Moore's Federal Practice* ¶ 23.04[2], at 23–136 through 23–137 (2d ed. 1978).

In a footnote to the above quotation the *Sosna* Court made the following observations as to certification:

"The certification of a suit as a class action has important consequences for the unnamed members of the class. If the suit proceeds to judgment on the merits, it is contemplated that the decision will bind all persons who have been found at the time of certification to be members of the class. Rule 23(c)(3); Advisory Committee Note, 28 U.S.C.App., pp. 7765–7766 [39 F.R.D. 69, 105–106.]. Once the suit is certified as a class action, it may not be settled or dismissed without the approval of the court. Rule 23(e)." 419 U.S. at 399 n.8, 95 S.Ct., at 557.

This Court ordered that a class action be certified in this case pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure. On April 25, 1978, defendants filed a motion to dismiss Nance as an intervenor because he had escaped from the Southern Maryland Correctional Camp Center, and his whereabouts were unknown. There is no indication, however, that "at the time the class action [was] certified," 419 U.S. at 403, 95 S.Ct. at 559, a proper class representative did not exist. Moreover, since the certification applies to claims brought by both Nance and Doe, this Court can now recognize plaintiff Doe as a proper class representative in light of the "relation back" reasoning suggested in *Sosna, supra. See also Frost v. Weinberger,* 515 F.2d 57 (2d Cir. 1975), *cert. denied,* 424 U.S. 958, 96 S.Ct. 1435, 47 L.Ed.2d 364 (1976).

Finally, even without resort to the "relation back" approach just discussed, it is by no means clear that the case would have to be dismissed even if *both* Nance *and* Doe had escaped. In *Cox v. Babcock and Wilcox Company,* 471 F.2d 13 (4th Cir. 1972), the Fourth Circuit held that where the plaintiff is no longer found to be a proper representative of the class, the case could be remanded to the District Court "with instructions that the class action be retained on the docket for a reasonable time to permit the presentation of any proper claims for further relief under such class action." 471 F.2d at 16. In the instant case, there is no reason to delay this case since plaintiff Doe is and always has been ready and able to serve as a proper class representative. Although Doe did not himself initiate the class action in this case, the Court granted certification and there is no reason to penalize the rest of the class because of the unavailability of Nance for trial.

Defendants also rely on *Holt v. Moore,* 541 F.2d 460 (4th Cir. 1976), in which the Fourth Circuit held that where plaintiff's action for declaratory and equitable relief had become mooted as of the date of his transfer from state to federal custody and since he was no longer in the custody of North Carolina authorities at the time of class certification, plaintiff could not be a member of the class which he sought to represent. Consequently, the Fourth Circuit remanded the case for dismissal of the injunctive, declaratory and class action aspects of the suit. Defendants argue that since Nance has escaped and is no longer in the custody of the Maryland authorities, nor the MRDCC, he cannot be a member of the class he seeks to represent. This reliance on *Holt* is misplaced, since the court's ruling turned on the fact that plaintiff Holt was *not* a member of the class at the time of certification. Here, however, in light of the intervention by plaintiff Nance, the claims of each petitioner were, in effect, consolidated in one case. The class certification granted by this Court applied to the entire controversy in which Nance and Doe were representative plaintiffs. This Court granted class certification in order to avoid mootness and to promote litigation which will "insure the full and fair consideration of the common issue." *Hansberry v. Lee,* 311 U.S. 32, 43, 61 S.Ct. 115, 119, 85 L.Ed. 22 (1940). Nance's absence does not preclude certification in this case since a representative plaintiff, Doe, was present when the action was certified.

As the Supreme Court noted in *Sosna, supra:*

"There must not only be a named plaintiff who has such a case or controversy at the time the complaint is filed, and at the time the class action is certified by the District Court pursuant to Rule 23, but there must be a live controversy at the time this Court reviews the case. . . . The controversy may exist, however, between a named defendant and a member of the class represented by the named plaintiff, even though the claim of the named plaintiff has become moot." 419 U.S. at 402, 95 S.Ct. at 559.

Furthermore, certification does not fail because neither Nance nor Doe were in the MRDCC at the time of certification. Since the MRDCC is intended to be a central diagnostic and classification center, inmates do not typically remain there for extended periods of time. To rule in defendants' favor would mean that transfer of a prisoner could automatically defeat the court's

certification decision. The ultimate result, then, would be to establish an end run around the liberalized approach to mootness and certification in the context of "rapidly mooting" cases.

## III. TRIAL ON THE MERITS

### A. Sexual assaults and overcrowding in the Maryland Penitentiary

This case proceeded to trial on the merits on September 25, 1978. During the course of the three day trial, the Court listened to numerous harrowing allegations concerning episodes of homosexual rape occurring in the Maryland Penitentiary and the MRDCC in particular. The pattern which emerged revealed serious inadequacies in both the operational aspects of the Maryland Penitentiary and the Diagnostic Center, and the classification and screening procedures employed by officials at the Diagnostic Center. As this opinion will make clear, these constitutional inadequacies are the by-product of widespread overcrowding in Maryland's prison facilities.[4] Any remedies mandated by this Court, then, must treat the specific allegations of this case within the context of the problems confronting Maryland's correctional facilities as a whole.

The MRDCC is physically situated within the confines of the Maryland Penitentiary in Baltimore and functions as the central diagnostic and classification facility for prisoners entering the state's correctional system. While the Diagnostic Center receives almost every offender destined for state incarceration, including first-time as well as repeat offenders, the inmates at the Maryland Penitentiary are typically the most serious offenders who warrant maximum security incarceration. Deposition of Defendant Bartram at 64–65, 68, and 70. (Plaintiff's Exhibit No. 25). By way of comparison between the two facilities, where the Maryland Penitentiary receives the "meanest inmates,"[5] the Diagnostic Center typically receives the "greenest."

Because of this difference between the inmate populations at the two facilities, inmates at the Maryland Penitentiary, known as population inmates, are supposedly segregated from the diagnostic inmates awaiting classification at the MRDCC. To this end, the diagnostic inmates wear white uniforms with large green numbers on the trouser legs unlike the population inmates who are permitted to wear regular "street clothes." Officials from the Diagnostic Center testified that while it was generally difficult to prevent commingling of the two inmate groups, prison officials were directed to prevent mixing while at meals, in the showers, at the movies, and on the cellblocks generally. Because of substantial overcrowding, however, these measures have not been altogether successful. The Diagnostic Center is located in the West Wing of the Maryland Penitentiary in the five story cage known as B Block. Immediately adjacent to B Block, at the east end of the same building is A Block where the population inmates live. Until a year ago, both diagnostic inmates and prisoners on protective custody could be housed on A Block. Today, however, a twenty-foot high chain fence separates the two cell blocks, but there are still several occasions when population inmates must traverse the B Block flats and diagnostic inmates must walk through A Block. These occasions provide opportunities for both commingling and sexual assaults.

Plaintiff Doe was homosexually raped during the course of a major riot occurring at the Maryland Penitentiary on March 29, 1973. At that time he was awaiting classification as a diagnostic inmate. Shortly before the riot broke out, Doe was waiting in his cell on the fourth tier in B Block to

4. The Maryland Penitentiary is the second oldest state prison facility still in operation in the United States. Paragraph 13 of plaintiff's amended complaint describes the current overcrowding at the Maryland Penitentiary and the Diagnostic Center:

Presently there are approximately 649 prisoners in the R.D.C.C. which was originally built for approximately 400 prisoners. In the Penitentiary there are currently approximately 885 prisoners. This overcrowding leads to serious health problems and has a direct effect upon the incidence of violence in both the R.D.C.C. and the Penitentiary, exaggerating the already dangerous conditions.

5. Testimony of Sebastian S. Valenti, Assistant Superintendent of the Diagnostic Center.

go to the showers between 6:00 and 6:30 p. m. The riot began on the ground level of A Block, and plaintiff could see inmates running along the tiers below him. One inmate had a cell key and was running along the tiers unlocking doors. Seeing other inmates being molested, plaintiff broke up a chair as a defensive weapon, at which point four or five population inmates came by and told plaintiff, "when we come back we're going to fuck you." Plaintiff ran immediately to the back of the tier, was pursued, hit over the head, knocked unconscious, and gang raped. As a result of this incident, he suffered severe injuries about the rectum, back, and head.[6]

As a result of the rape, plaintiff brought this suit pursuant to 42 U.S.C. § 1983 charging the defendants with having failed to maintain security and control of the penitentiary in order to prevent the riot and his own resulting injuries.

Had the riot and sexual assaults which transpired on March 29, 1973 been a totally unforeseen, unforeseeable occurrence, this case would probably not have reached the trial stage. The amended complaint, however, charges defendants with "deliberate failure and/or gross negligence . . . in failing to take proper steps to provide proper security for and to insure the safety of the plaintiff and to protect him from threats, assaults, and sexual assaults." Amended Complaint at paragraph 25. The Complaint further noted that:

During his short confinement in the [MRDCC] plaintiff was threatened, harassed and was the recipient of homosexual advances. Other prisoners, specifically inmates of the Penitentiary, demanded plaintiff's possessions or requested homosexual favors in exchange for protection. On March 29, 1973, a complete failure of the already inadequate security occurred and a riot ensued. This riot which defendants had actual warning of or should have anticipated was due to the failure of the defendants to take proper security actions in the face of the danger, the existence of the already inadequate se-

curity measures, and the deplorable conditions in the Penitentiary and the [MRDCC].

Amended Complaint at paragraph 22. In *Woodhous v. Commonwealth of Virginia*, 487 F.2d 889 (4th Cir. 1973), this Circuit had already recognized that:

While occasional, isolated attacks by one prisoner on another may not constitute cruel and unusual punishment, *Penn v. Oliver*, 351 F.Supp. 1292 (E.D.Va.1972), confinement in a prison where violence and terror reign is actionable. A prisoner has a right, secured by the eighth and fourteenth amendments, to be reasonably protected from constant threat of violence and sexual assault by his fellow inmates, and he need not wait until he is actually assaulted to obtain relief.

487 F.2d at 890. *See also Withers v. Levine*, 449 F.Supp. 473, 476 (D.Md.1978); *Martinez Rodriguez v. Jimenez*, 409 F.Supp. 582, 594 (D.P.R.1976); *Van Horn v. Lukhard*, 392 F.Supp. 384, 387 (E.D.Va.1975).

While riots may not have been frequent enough at the Maryland Penitentiary to have established a perpetual reign of terror, it did appear at trial that the institutional procedures for segregating diagnostic and population inmates were not taken seriously. As a result, a subculture of crime grew up and was fostered within the walls of the Penitentiary itself. Superintendent Valenti acknowledged that population inmates would often single out newly arrived diagnostic inmates for sexual relations and then "set up" the diagnostic inmates by offering protection from other inmates, food, cigarettes or other favors. When a sexual relationship was consummated, the victim was said to have been "snatched." These snatchings are rarely reported for several reasons. First, there is the fear of reprisals, but more importantly there is the stigma which attaches once it becomes known throughout the institution that an inmate was raped. The stigma, in this instance, serves to single out an inmate as an easy

---

**6.** MRDCC files containing "Serious Incident Reports" were admitted into evidence and showed that between mid-November, 1975 and March, 1978, some eighteen rapes were reported at the Diagnostic Center.

mark, thereby increasing the likelihood of further sexual assaults. *See Withers v. Levine, supra,* 449 F.Supp. at 475.[7]

At trial, several inmates and former inmates of the Diagnostic Center, all of whom had been sexually accosted and some of whom had been raped, testified as to how the sexual "pick up" process operated in prison. A population inmate would get the attention of a new inmate by calling out to him, "Hey 'home boy' or 'slim'" and then provide him with some sort of favor. Once the new inmate accepted the favor, he became indebted to his benefactor and sexual relations were a frequent *quid pro quo.* Dr. Stanley Brodsky, an expert in psychology and corrections, essentially confirmed this hunter-hunted pattern described by the inmates. Remarking that homosexual relations in prison frequently took many forms —consensual, commercial, romantic, promiscuous, and coercive—Dr. Brodsky confirmed that a fairly routine pattern could be identified insofar as young, effeminate, newly admitted inmates were concerned. Inmates with these characteristics were stalked, coerced, bribed, offered protection, or simply raped. Insofar as the attackers were concerned, Dr. Brodsky testified that they were generally population inmates convicted of more serious crimes and sentenced to longer terms. Sensing their freedom limited and a reversal of their status after lengthy confinement, an assaulter would use sexual assault to overcome or compensate for his own feelings of degradation or to enhance his status among his fellow inmates.

■ The possibility of precisely this type of situation arising explains the necessity for segregating the two inmate populations. Both the victim and likely offender are identifiable at least in terms of general characteristics, but there was considerable evidence demonstrating that a reasonably precise profile of the likely victim could be painted. According to prison officials, several witnesses, and Dr. Brodsky, the typical sexual assault victim in prisons is young, between seventeen and twenty-three years of age, with a small physical frame in the neighborhood of 125 to 130 pounds, and relatively new to the institution. Given this well-entrenched institutional sub-culture of which the prison authorities were undoubtedly aware,[8] any serious deficiencies in actual prison procedures which allowed frequent commingling between diagnostic and population inmates and the ensuing sexual assaults border on gross negligence, thereby negating any good faith immunity defense under 42 U.S.C. § 1983. *See e. g., Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 43 L.Ed.2d 214, *reh. denied,* 421 U.S. 921, 95 S.Ct. 1589, 43 L.Ed.2d 790 (1975); *Little v. Walker,* 552 F.2d 193, 196 (7th Cir. 1977), *cert. denied,* 435 U.S. 932, 98 S.Ct. 1507, 55 L.Ed.2d 530 (1978); *Knell v. Bensinger,* 522 F.2d 720, 724–25 (7th Cir. 1975).

The evidence of negligence in this case was both overwhelming and incredulous. Commingling of diagnostic and population inmates occurs in almost every nook and cranny of the Maryland Penitentiary and has been going on for some time. Population inmates attend movies with diagnostic inmates and may be found together at the prison hospital, recreational and dining facilities, at religious gatherings, and on the flats in the cell blocks. Several witnesses reported that population inmates roam the diagnostic tiers both night and day selling goods such as sodas, cigarettes, and even several varieties of hot and cold sandwiches.

7. Inmates are likewise unlikely to file adjustment reports about such incidents since the reports and resulting adjustment hearings only increase the chance of the information becoming common knowledge throughout the institution. While an inmate can request protective custody, this means an end to movie, television, and recreational privileges since a protective custody inmate spends almost 22 hours a day in his cell. Protective custody inmates also lose the right to earn good time credits which can reduce the overall lengths of their sentences. These conditions, therefore, contribute to the lack of reporting of homosexual assaults and rapes.

8. The Serious Incident Reports by themselves indicated that sexual assaults were not rare occurrences. *See* note 6, *supra.* At trial, Mr. Valenti indicated familiarity both with the frequency of such attacks and the manner in which they typically occurred.

Population inmates often do repairs in cells on the diagnostic tiers, and there have been occasions according to plaintiff Doe where population inmates could obtain phony work orders to gain access to a diagnostic inmate's cell. In one instance in 1977, two population inmates each morning for two successive weeks entered one diagnostic inmate's cell, ostensibly to correct the plumbing.

"Skating," or being caught out of bounds inside the prison facility, is a common Penitentiary occurrence. Inmates can skate throughout the facility by filling out fake passes which are readily available. The passes come on pads and some inmates have stolen entire pads of passes which they can then complete themselves in order to go almost anywhere they choose. Since population inmates perform chores as clerks, plumbers, and electricians, and work in the hospital, kitchen, woodshop, and printshop, they can be found simultaneously almost anywhere diagnostic inmates can be found. Plaintiff Doe candidly admitted that wherever he could walk, a population inmate could walk too. Although population inmates are supposedly supervised by prison guards while performing chores in the diagnostic section, the evidence showed that the population inmates often went about their business unattended.

In response to these allegations, the defendants admitted that some commingling occurred but tried to minimize its seriousness. They stressed the measures undertaken to separate diagnostic and population inmates, but it was clear that policy and reality were entirely different. Emphasizing that most of the problems could be explained by overcrowding, the defendants pointed to the current construction of a new diagnostic center which is expected to be completed in January, 1980.[9] The new MRDCC will be physically distinct from the Maryland Penitentiary. Located across the street from the present facility, the new Diagnostic Center will house 400 inmates beginning in March, 1980 and should serve to reduce the overcrowding at the Maryland

Penitentiary. What is troublesome, however, is the remedy to be prescribed during the interim period prior to the opening of the new Diagnostic Center.

### B. Overcrowding

Just recently this Court has had occasion to review the general effects of prison overcrowding throughout the state correctional system, including state and county jails. The congestion at state institutions is so bad that overcrowding and backlogs result all the way down the line and "bottom out" in the county jails. For example, in a series of cases challenging the conditions prevailing in the Cecil County Jail, the Court noted that without overcrowding in the state system, there would be no backlog of inmates destined for the state institutions:

at almost any given point in time, there was a backlog of some ten inmates ultimately destined for the state system. Because of overcrowding in state facilities, however, inmates in this backlog remained at the Cecil County Jail from three to six weeks. Thus, it appears that at only one period, January, 1977, would the Cecil County Jail have been overcrowded beyond the seventy inmate maximum for reasons other than overcrowding by the state institutions.

*Adkins, et al. v. DeWitt, et al.,* Civil Nos. Y–77–1205, Y–77–2032, Y–77–2033, Y–78–1166, Y–78–1673 (D.Md. January 22, 1979). The general problem of overcrowding in Maryland prisons is apparent at all levels, but real relief can only come from correcting the situation at the top.

To this end, Judge Harvey in *Johnson v. Levine,* 450 F.Supp. 648 (D.Md.1978), has ordered an elimination of the overcrowding at the Maryland Penitentiary and the Maryland House of Correction. Recognizing that "[o]vercrowding, with all of its consequences, can reach such proportions that the impact of the aggregate effect amounts to cruel and unusual punishment," *Johnson v. Levine,* 588 F.2d 1378 (4th Cir. 1978), the Court of Appeals upheld the District

---

**9.** Mrs. Bartram testified that at the time of trial there were some 350 inmates backlogged in various county jails awaiting transfer to the Diagnostic Center.

Court's order to terminate the overcrowding but refused to sanction the lower court's shortened timetable for the state to comply:

> [W]e are convinced that the overcrowded conditions cannot be completely eliminated without the construction and utilization of a new facility, which Maryland proposes to have available by June 1, 1980. Since the constitutional violation here is not as extreme or as shocking as in some of the reported cases, and since Maryland's plan is practical and reasonable and will achieve the required objective of elimination of overcrowding of its penal institutions, we think its plan and its schedule deserve judicial approval.

588 F.2d at 1381. Following the Fourth Circuit's dictates in *Johnson*, this Court, while recognizing the tension between constitutional principles and budgetary limits, gave similar approval to Cecil County's timetable for constructing its new jail. *Adkins, et al. v. DeWitt, et al., supra.* At the same time, while the federal courts have been reluctant to intervene in the daily functioning of state penal systems, *Procunier v. Martinez*, 416 U.S. 396, 404–05, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Cruz v. Beto*, 405 U.S. 319, 321, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); *Novak v. Beto*, 453 F.2d 661, 671 (5th Cir. 1971); *Palmigiano v. Garrahy*, 443 F.Supp. 956, 978 (D.R.I.1977); *Pugh v. Locke*, 406 F.Supp. 318, 328 (M.D. Ala.1976), *aff'd*, 559 F.2d 283 (1977), *cert. denied*, 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978); *Diamond v. Thompson*, 364 F.Supp. 659, 662 (M.D.Ala.1973), they have nevertheless been unanimous in rejecting budgetary limitations as a meaningful defense by the state.

■ The Supreme Court recognizes three legitimate functions of a correctional system: deterrence, rehabilitation, and institutional security. *Pell v. Procunier*, 417 U.S. 817, 822–23, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). While incarcerated, prisoners cannot be denied the protections of the Fourteenth Amendment's Due Process and Equal Protection Clauses, *Washington v. Lee*, 263 F.Supp. 327, 331 (M.D.Ala.1966) (three judge panel), *cert. denied*, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968),

and "a state is not at liberty to afford its citizens only those constitutional rights which fit comfortably within its budget." *Pugh v. Locke, supra,* 406 F.Supp. at 330. In *Holt v. Sarver*, 309 F.Supp. 362, 385 (E.D.Ark.1970), *aff'd*, 442 F.2d 304 (8th Cir. 1971), the court wrote:

> Let there be no mistake in the matter; the obligation of the Respondents to eliminate existing unconstitutionalities does not depend upon what the Legislature may do, or upon what the Governor may do, or, indeed, upon what Respondents may actually be able to accomplish. If Arkansas is going to operate a Penitentiary System, it is going to have to be a system that is countenanced by the Constitution of the United States.

*See also Palmigiano v. Garrahy, supra,* 443 F.Supp. at 979.

■ A particularly sensitive issue arises in cases where a state has moved in good faith and very often at immense expense towards eliminating constitutional inadequacies but where as a realistic matter, the facility cannot be shut down and the constitutional deprivations will admittedly continue to some degree during an interim period. In *Adkins, supra,* this Court framed the problem in these terms:

> federal courts occupy a difficult position in which they have a duty on the one hand to redress constitutional deprivations whenever they occur, and on the other to do so in a fashion which is realistic in terms of what can be expected from the states. The conditions in our jails—state and federal—only serve to highlight this inescapable tension between the dictates of the Constitution and the shortcomings of the public pocketbook. Constitutional overcrowding, for example, provides a particularly acute instance in which constitutional deprivations can frequently be corrected by the state's good faith compliance over time. Since new prison facilities cannot be constructed over night, just how much time should be afforded the state is itself a serious question challenging the core of federal-state relations.

*Adkins, supra,* at 5. Consequently, this Court sanctions the actions already being taken by the State of Maryland to eliminate the overcrowding in the Maryland Penitentiary by transferring the diagnostic inmates to the new Diagnostic Center next year. Once this transfer occurs, more spaces will be opened up in the Penitentiary which should, in turn, help relieve overcrowding in other state and county facilities. The issue which remains to be addressed, and which the Court will consider, is the steps which the state must take during this interim period to minimize the occurrence of further constitutional deprivations.

*C. Deficiencies in the present inmate classification procedure*

The evidence presented at trial on the issue of overcrowding made it painfully evident that Maryland has been warehousing prisoners at the Diagnostic Center. One way of eliminating this problem, assuming vacancies are available to be filled elsewhere, is to speed up the classification system, possibly routing inmates around the Diagnostic Center unless it is absolutely necessary to send them there to undergo the battery of tests which the state now requires.

Two Division of Correction Regulations ("DCR's") set forth the organization and function of the MRDCC as well as explain the factors on which an inmate's initial assignment will be based. DCR 10–2(3) lists the following eight functions of the MRDCC in accordance with article 27, section 690,[10] of the Annotated Code of Maryland:

a. Provide maximum custody of the offender.

b. Provide identification of the offender, to include fingerprinting and photographing and provide State Police and F.B.I. with this identification information.

c. Perform and complete physical examination and initiate corrective medical and dental treatment, if necessary.

d. Provide the offender with an orientation of Divisional and Institutional

policies and procedures "and with an Inmate Manual."

e. Initiate the offender's Base File and allied records.

f. Conduct educational testing, vocational evaluation, and psychological testing of the offender.

g. Perform a complete evaluation of each offender based on social and environmental factors, marital status, military record, psychological and psychiatric factors, personal traits, education, employment skills, criminal background and factors concerning the sentence. Refer problems to law students, chaplains, and vocational rehabilitation personnel as necessary.

h. Assign and transfer the inmate to an institution that can best provide for the inmate's needs.

DCR 110–5(4)(c) provides that an Initial Classification Team should evaluate each inmate in order to determine the institution which can best provide for his rehabilitation and security. In making such a determination, the following factors must be considered:

(1) Age

(2) Length of sentence

(3) Type of offense

(4) Prior criminal history

(5) Social history

(6) Psychological and psychiatric reports

(7) Intelligence level

(8) Educational level

(9) Work history

(10) Previous adjustment records.

In his trial testimony, Sebastian Valenti explained that two days a week the state sends out a four-member mobile classification team to the various county jails in order to see if there are any minimum security inmates destined for the state system who can be classified promptly. While social histories but not psychological reports can be obtained at the jails, Valenti indicated that both intelligence and psychological tests were waived for inmates sent directly to the minimum security camp sys-

---

**10.** Article 27, section 690 provides for the sentencing of inmates to the jurisdiction of the

Department of Corrections rather than to particular institutions and facilities generally.

tem. These inmates spend roughly three hours at the Diagnostic Center for photographing, physical examination and fingerprinting before being sent to the camps. Valenti noted that the mobile classification teams are restricted from going to the Baltimore City Jail and that principally they were looking to process inmates with sentences of between three months and six years who were destined for minimum security facilities.

Mrs. Bartram, the MRDCC Superintendent, elaborated upon Mr. Valenti's testimony in regard to the nature of the testing conducted at the Diagnostic Center.[11] She said that very few inmates processed at the MRDCC eventually were sent to the Penitentiary and a substantially greater percentage were destined for the camp centers. This fact only highlights the serious problems involved in having the Diagnostic Center located within the confines of the Maryland Penitentiary. With the commingling almost impossible to prevent, many of those inmates destined for minimum security institutions were being exposed to a more hardened criminal population, and the impact upon their eventual rehabilitation was definitely negative.

Dr. Brodsky testified about the state's present classification program, pointing out that only approximately 5% of all inmates processed actually required the full testing now provided by the state. In his opinion, only the first four factors—age, nature of the offense, length of sentence, and prior record—were crucial in making the initial diagnostic decision.[12] The state's goal in classification, as he saw it, should be to identify as quickly as possible the 5% who needed the more in-depth evaluation and classify the remaining majority on the basis of the four factors described above.

The trial presented two competing classification philosophies: while state officials favored a central classification system, Dr. Brodsky endorsed a more decentralized approach in which most of the decisions were made locally just after sentencing. Any initial error could be readily corrected, as Mrs. Bartram noted that every sixty days an inmate can request reclassification.

In *Withers v. Levine*, 449 F.Supp. 473, 476 (D.Md.1978), this Court observed that "[c]lassification of prisoners is a matter of discretion for prison officials. Courts will not ordinarily substitute their judgments for those of the officials." *See also Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451, *reh. denied*, 429 U.S. 873, 97 S.Ct. 191, 50 L.Ed.2d 155 (1976); *Montanye v. Haymes*, 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976); *Sweet v. South Carolina Department of Corrections*, 529 F.2d 854 (4th Cir. 1975). The court in *Palmigiano v. Garrahy*, 443 F.Supp. 956, 965 (D.R.I.1977), observed that:

> Classification is essential to the operation of an orderly and safe prison. It is a prerequisite for the rational allocation of whatever program opportunities exist within the institution. It enables the institution to gauge the proper custody level of an inmate, to identify the inmate's educational, vocational, and psychological needs, and to separate non-violent inmates from the more predatory.

As long as the MRDCC remains within the walls of the Maryland Penitentiary, these classification goals are frustrated. With the opening of the new Diagnostic Center, these problems should be minimized, if not eliminated.

But this Court has another concern in light of the expert testimony that most of the inmates sent to the MRDCC spent too much time there taking unnecessary tests. While this Court cannot be in the business of reviewing particular inmate classifica-

---

11. Mrs. Bartram stated that the testing had three phases: (1) a group test as to overall personality, (2) additional personality testing to determine the presence of any organic brain damage, and (3) Rorschach tests and the Wechsler Adult Intelligence test to discover any more complex disorders. Educational testing is also performed in order to help determine an inmate's level of achievement.

12. Mrs. Bartram's deposition remarks corroborated Dr. Brodsky's views that the first four factors were the primary bases on which classifications were premised. *See* Bartram Deposition at 56–84. Plaintiffs' Exhibit No. 25.

tions, it is concerned that the state's overall classification process operates efficiently and swiftly in order to provide rehabilitation and to guarantee that once an inmate is sentenced he begins serving that sentence in the appropriate facility. The Court sees no reason why the whole classification process cannot be speeded up at least for the vast majority of inmates who pose no classification complications. Mrs. Bartram testified that fifty percent of the inmates processed through the Diagnostic Center are sent to the prison camps, released outright or sent to the Maryland Correctional Training Center, a medium security facility located in Jessup, Maryland. The Court takes judicial notice of the procedures used in federal court whereby a person's destination in the federal prison system is often determined at the time of sentencing. Under the state system, inmates currently spend too much time awaiting transfer from the county jails to the MRDCC and then spend too many weeks in the Diagnostic Center before reaching their eventual destination. Such delays are detrimental to inmates who, having been sentenced, should begin their rehabilitation immediately.

The present classification system in some respects both fosters overcrowding and commingling and is a by-product of that overcrowding. If other facilities are backlogged, then a conceivable justification for the overcrowding of inmates from four to six months at the MRDCC is that these inmates must undergo prolonged testing. The problem with this rationale lies in its faulty initial premise, namely, that the differences between Maryland prison facilities are sufficiently noticeable that clear-cut, finely tuned diagnoses and classifications can be made in order to conclude that inmate A belongs at institution X rather than institution Z. While a finely tuned diagnostic system is a laudable goal, it presupposes facilities capable of providing the proper remedial prescriptions, and these institutions simply do not exist in Maryland at this time. One can diagnose the patient, so to speak, but the precise treatment is generally not available.

One can identify broadly that some correctional facilities are better for some people than others but institutions and diagnoses cannot presently be matched with sufficient precision so as to justify the lengthy delays in moving new inmates out of the Diagnostic Center into their ultimate state facility. Lengthy diagnostic incarceration premised upon legitimate diagnostic grounds but really invoked to divert attention from the massive warehousing of inmates should be avoided in the future.

The Court recognizes that, as with overcrowding, these problems will not disappear over night. Consequently, the Court now turns to those remedial measures which the state must take to deal with these problems during the yearlong period before the new Diagnostic Center opens.

### D. Relief during the interim period

Having sanctioned the state's overall construction timetable for the new Diagnostic Center, the Court is still concerned about conditions in the Maryland Penitentiary and the MRDCC during the interim period. There is little doubt that the officials at the Maryland Penitentiary and Diagnostic Center have failed to provide plaintiff Doe and the others in his class with reasonable protection from violent inmates. Under the Eighth Amendment prisoners are entitled to protection from the assaults of other inmates. *Holt v. Sarver,* 442 F.2d 304, 308 (8th Cir. 1971). The standards which are to guide respondents in a case such as this are by no means of recent vintage. The Eighth Amendment has long been interpreted as prohibiting those punishments incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958). *See also Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), *reh. denied,* 429 U.S. 1066, 97 S.Ct. 798, 50 L.Ed.2d 785 (1977) and the cases and sources cited therein.

At the conclusion of the trial this Court candidly expressed its reluctance to intervene in a detailed manner prior to giving the state an opportunity to ameliorate the situation during the interim period with a

plan of its own. Consequently, the Court gave the state several weeks to devise a plan and specifically requested the state to concentrate on two problems: avoiding the commingling and devising a means whereby those prisoners who are more readily classifiable can be classified without having to be routed through the Diagnostic Center. The state responded with the plan which is contained in Appendix I. While the plan addresses the commingling issue, it is deficient in failing to devise a model using the approach suggested by Dr. Brodsky for classifying inmates on the basis of their age, length of sentence, the nature of the crime, and any past offense(s) so as to avoid sending these inmates to the Maryland Penitentiary in the first place if they are readily identifiable as inmates who belong in the prison camps rather than a maximum security institution for hardened felons. The Court recognizes that the state essentially finessed this point since indirectly, full scale compliance would at this time be impossible as a practical matter.

The warehousing at the Diagnostic Center has been caused by overcrowding throughout the entire Maryland prison system. To force prisoners at this time to bypass the Diagnostic Center would take some of the pressure off the state system only to force it upon the counties which would face similar problems almost immediately. There exists, then, a domino effect downwards: with overcrowding throughout the state system, removing the pressure from the top only seems to force the problem to a head elsewhere. As a result, during the yearlong interim period, as a practical matter, a new classification system must await the correction of overcrowding at state institutions.

In relieving the state at this time from having to alter drastically its prison classification system, the Court is not permitting the state to avoid the issue altogether. At trial, Dr. Brodsky testified that about fifty percent of all inmates were readily classifiable and assignable on the basis of four factors: age, nature of the offense, the sentence imposed, and prior record. When the Court asked Mrs. Bartram why, in light of this fact, so many people had to be routed through the Diagnostic Center she replied that classification required assessment of a "human element" which is best appraised by more thorough evaluation.

Insofar as a "human element" is concerned, this Court concludes just the opposite. It is not "human" to subject inmates to a battery of psychological and educational tests as a pretext for classifying them when such tests are not needed. Diagnostic centers are not intended to house people who have already been sentenced. The Court notes that Maryland has frequently used the Diagnostic Center as a prison due to overcrowding. In light of the steps being taken to reduce overcrowding and commingling, the Court directs Maryland prison authorities to take the following steps toward revising their classification programs:

1. The state should consult with recognized experts to devise a more efficient classification procedure.

2. The goal ultimately should be to classify inmates as quickly as possible after sentencing in order that they may begin serving their sentences at the appropriate institution, not at the Diagnostic Center.

3. Additional, more complex testing should be reserved for those inmates who truly need it.

4. In creating new classification procedures the state is directed to consult with county correctional facilities in order to develop a more efficient, streamlined procedure. Possible approaches might include expanding the use of the mobile treatment centers and arranging for the counties to begin performing fingerprinting, photographing and other routine processing now done at the Diagnostic Center.

5. The state is directed to prepare this plan for implementation at the same time the new Diagnostic Center is to open, and the plan should be submitted to this Court for final review and approval no later than January 31, 1980.

■ Turning now to the state's proposals for preventing commingling during the interim period, the Court directs the state to implement those procedures outlined in Appendix I and to complete these measures within sixty (60) days. The Court notes that if these measures fail to reduce significantly the episodes of homosexual assaults between population and diagnostic inmates, it is prepared to order more drastic steps to ensure the safety of inmates at the Diagnostic Center.

*Little v. Walker,* 552 F.2d 193 (7th Cir. 1977), presents facts similar to the instant case with regard to an inmate plaintiff seeking to hold prison and correctional authorities liable under 42 U.S.C. § 1983 for failing to protect him from sexual assault. One of the issues on appeal involved the standard of liability to be applied with regard to defendants' responsibilities. Although the court remanded the case for a fuller determination as to which, if any, of the defendants could claim immunity, it said that plaintiff did not have to show that defendants had a malicious intent or impermissible motivations towards him. 552 F.2d at 198. Plaintiff would be entitled to damages, however, if he could show a deliberate deprivation of his rights which the court discussed in detail as follows:

> In this opinion we use the term "deliberate deprivation" to denote two species of culpability: actual intent and recklessness. *Kimbrough v. O'Neil,* 545 F.2d 1059, 1061 and n. 4 (7th Cir. 1976) (*en banc*). Actual intent here encompasses both the special intent to deprive the plaintiff of his constitutional rights as well as the general intent to perform the conduct whose "natural consequence" is the deprivation of the plaintiff's constitutional rights. See *Monroe v. Pape,* 365 U.S. 167, 187, 207, 81 S.Ct. 473, 5 L.Ed.2d 492; *Bonner v. Coughlin,* 545 F.2d 565, 567 (7th Cir. 1976) (*en banc*).
>
> Under *Wood v. Strickland, supra,* and *Knell v. Bensinger,* [522 F.2d 720] *supra,* recklessness under Section 1983 comprehends only an objective standard: whether the conduct is with "such disregard of the [plaintiff's] clearly established constitutional rights that [the] action cannot be reasonably characterized as being in good faith." 420 U.S. at 322, 95 S.Ct. at 1001; 522 F.2d at 725. The subjective standard sometimes a part of definitions of recklessness, corresponding to "white heart/empty head" good faith, is not an appropriate component of the definition of reckless behavior sufficient to state a claim under Section 1983 for the deprivation of constitutional rights. Cf. *Sundstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033, 1045 (7th Cir. 1977). While mere inadvertence or negligence cannot support a Section 1983 action raising Eighth Amendment issues, deliberate indifference "[r]egardless of how evidenced"—either by actual intent or recklessness—will provide a sufficient foundation. *Estelle v. Gamble,* 429 U.S. 97, 105, 97 S.Ct. 285, 50 L.Ed.2d 251, and authorities cited by Justice Marshall at 4025 nn. 10–12; see also *Hampton v. Holmesburg Prison Officials,* 546 F.2d 1077 (3d Cir. 1976); *Smart v. Villar,* 547 F.2d 112 (10th Cir. 1976).

522 F.2d at 197–98 n. 8. While plaintiffs have voluntarily dismissed their damages claims in the present case, the discussion in *Little* coupled with the mandates of this case should provide fair warning to defendants in the future. With both the constitutional rights and standards now clearly delineated, there can be no excuse for continued deprivations of the kind alleged in this case. The defendants are on notice that this Court stands ready to consider meritorious claims for money damages by inmates filed pursuant to 42 U.S.C. § 1983 where prison and correctional authorities are alleged to have failed to provide the requisite physical safeguards. Such cases must obviously be treated on an individual basis; however, with the duties now clearly spelled out, the likelihood of a good faith or immunity defense prevailing has substantially diminished.

■ The state is likewise directed to take measures which will put an end to the "skating" practices at the Maryland Penitentiary as part of the state's program to terminate commingling of diagnostic and population inmates. Passes should be more

zealously guarded and perhaps a system can be worked out in which passes have sequential numberings so that theft of a pad of passes can be more easily detected.

■ Finally, given that a fairly clearcut profile of sexual assault victims in prisons can be made, the state should make every effort to identify likely victims of homosexual assaults early in the initial classification process. While such identification does not have to be a formal one (*e. g.*, publicly labeling a new inmate as a likely victim could have a self-fulfilling effect), it should be attempted at least insofar as trying to minimize rapes are concerned. Mrs. Bartram stated that classification required attention to a "human element," and it is just such attention which the Court hopes will be paid when new inmates arrive at the Diagnostic Center.

The Court has endeavored to articulate the standards which apply to the constitutional claims raised in this case. In directing the state to take particular actions, the Court is not unmindful of the difficulties presented whenever the federal courts attempt to fine tune a state's prison system. Because of this, the Court has tried to frame its dictates so as to leave some room for the ingenuity of state officials in reducing the incidence of homosexual rape. As this Court said in *Withers v. Levine, supra,*

> Systematic, preliminary screening to identify special problems and review the compatibility of cellmates generally should be addressed in any proposed plan. Officials should also consider other options to reduce risks, i. e., more guards assigned to idle tier, single cell more incoming inmates. These suggestions are not intended to be exhaustive. The experience and expertise of prison officials should produce procedures, which utilize various alternatives, far better than a particular formulation which might be made by this Court.

449 F.Supp. at 478.

Accordingly, it is this 5th day of March, 1979, by the United States District Court for the District of Maryland, ORDERED:

1. That defendants' motion to dismiss part of plaintiff Doe's amended complaint and to dismiss plaintiff Nance as intervenor and to decertify the class action be, and the same is, hereby DENIED;

2. That the state's construction timetable for the new MRDCC be, and the same is, hereby APPROVED;

3. That the state's proposals for terminating commingling of population and diagnostic inmates must be implemented within sixty days;

4. That the state take any and all such measures so as to comply with the standards set forth in this Memorandum and Order;

5. That costs and reasonable attorney's fees for plaintiffs be assessed against defendants; and

6. That a copy of this Memorandum and Order be sent to plaintiffs and to the Attorney General.

## APPENDIX I

*Proposed Plan Submitted by the State of Maryland for Separating MRDCC and Penitentiary Residents*

A Federal Court decision rendered by Judge Young on September 27, 1978, requires the Maryland Division of Correction to propose a plan that would allow for the separation of Reception Center residents and the Penitentiary population during the interim period until the new Reception Center opens in 1980. This plan is to be presented to the Courts for their consideration. The Court further advised that, if a suitable plan is not forthcoming, it would be necessary for the Federal Court to issue an Order in this regard.

Under the circumstances, we submit for consideration the following proposal which we feel will meet the Court's concerns and the concerns of the Plaintiff, until such time as the new Reception Center is open and the Reception Center inmates can be moved out of the Maryland Penitentiary. In this proposal, during mass movement, all end gates in A-Block will be secured.

▮▮▮▮▮▮▮

### FEED–UP

During the breakfast, there is to be no intermingling. Breakfast is served to MRDCC inmates at 6:45 A.M. when Maryland Penitentiary inmates are locked up. Maryland Penitentiary inmates do not eat breakfast until MRDCC inmates have eaten and are secured.

To prevent intermingling during the lunch time, a fence passageway for MRDCC inmates to go back and forth from B-Block to A-Block will be erected. The fence would be a chain-linked fence in nature coming up approximately four or five feet from the wall. It will be approximately eight feet high. The chain-linked wire will extend to the wall, giving a roof effect. The Reception Center inmates will use this passageway for all meals, going through the Rotunda to the fenced-in area alongside the South Wing. The existing fence will be extended to reach from the Rotunda to the Dining Room and appropriate security gates will be installed. They will go in the East door, with the West door being secured. The Reception Center inmates will travel alongside the wall of the South Wing and enter the East door of the Dining Room inside the fence. The West door will be secured.

During the Reception Center feed-up, the only persons inside the Dining Room eating at this time would be Reception Center inmates, supervised by custodial personnel.

After all feed-ups, inmates will return to the housing unit in the same manner. The above procedure will, therefore, eliminate any intermingling between Maryland Penitentiary and Reception Center inmates.

### TESTING AND INTERVIEWS

When testing is required, the inmate, on return from the Dining Room, will proceed up the front steps of A-Block to the MRDCC holding area. A new post will be established on the Maryland Penitentiary A-Block front stairs to insure this area is cleared of Maryland Penitentiary population and all end gates are secured to A-Block.

When testing is completed, the Reception Center inmates will return to B-Block by the MRDCC walkway established along A-Block streetside. This will insure that no Reception Center inmate being returned to B-Block will be exposed to the Maryland Penitentiary population.

### EARLY COURT AND HOSPITAL TRIPS FOR MRDCC INMATES

MRDCC inmates who have early trips are escorted to the Dining Hall at approximately 6:30 A.M. for breakfast. After breakfast, they are escorted back to the MRDCC Storeroom where they will be secured in the existing holding area under the control of the MRDCC Storeroom Officer.

The above procedure will insure that MRDCC inmates are separate and apart from the Maryland Penitentiary inmates when preparing to leave the institution on trips.

### SICK–CALL

On hospital and sick-call trips, MRDCC inmates will be escorted from B-Block to the hospital by establishing two additional Officer posts for escorting duties in B-Block. New procedures will be established in the hospital where Reception Center inmates will be escorted to the waiting area on the first floor where they will be secured, given sick-call blood tests, and any other medical requests needed at that time. MRDCC sick-call is held separately from the Maryland Penitentiary sick-call.

### RECREATION

On returning from the noon meal, the MRDCC inmates will be directed into the MRDCC recreation yard thus eliminating contact with Maryland Penitentiary inmates.

MRDCC recreation is in the Lower One Yard. After the noon meal, inmates will be allowed access to this yard by exiting the Dining Hall, traveling the fenced-in MRDCC walkway to the Rotunda, through the Rotunda, giving the MRDCC inmate access to the MRDCC recreation area.

During the MRDCC movement, the Flats and Rotunda area will be cleared of the Maryland Penitentiary inmates.

*VISITING (New Procedure)*

On receiving notification of a visit, the MRDCC inmate will be issued a pass by the Wing Officer, will exit B-Block by the MRDCC walkway, proceed to the front of the second tier of A-Block which is patrolled by the newly established post, and will be allowed into the lower level through the existing door. This new procedure will eliminate the MRDCC inmate from having to go to the Traffic Office to pick up his visitor, thus eliminating contact with the Maryland Penitentiary inmates.

MOVIES

MRDCC inmates will exit the Dining Hall via the MRDCC walkway, will proceed through the Rotunda into the West Wing, and proceed up the steps into the auditorium. The end gates on all tiers will be secured and the stairwells will be cleared of all Maryland Penitentiary inmates.

On exiting the movies, MRDCC inmates will proceed down the front stairs and return to B-Block through the A-Block passageway, thereby eliminating all contact with Maryland Penitentiary inmates.

SHOWERS

Showers for Maryland Penitentiary inmates housed in A-Block will be established with the erection of a fenced-in walkway on the Yard side of B-Block. Maryland Penitentiary inmates will have access and egress to and from the West Wing showers via this walkway which will eliminate contact between Maryland Penitentiary and MRDCC inmates.

This new plan will require three additional posts which require hiring six additional Correctional Officers and, in view of that, two supervisory and two on 12–8. This plan also requires erecting walkway areas in A-Block, B-Block, and No. 1 Yard, and extending the existing fence in the South Wing to the Dining Room.

APPENDIX II

On May 7, 1979, the Court approved defendants' revised plan for segregating MRDCC inmates from Penitentiary inmates in lieu of the relief ordered in paragraph two of the "Feed-up" section in Appendix I. The Court further directed all parties to continue working together to implement both the March 5, 1979 Order and the revised plan until such time as all counsel were satisfied that the changes directed by the Court had been fully implemented. The revised plan reads as follows:

*Proposed Plan for Segregation of MRDCC and Penitentiary Residents*

A Federal Court decision rendered by Judge Young on September 27, 1978 requires the Maryland Division of Correction to propose a plan that would allow for the separation of Reception Center residents and the Penitentiary population during the interim period until the new Reception Center opens in 1980.

Under the circumstances, we respectfully submit for consideration the following proposal, which we feel will meet the Court's concerns and those of the plaintiff until such a time as the new Reception Center is open and the Reception Center residents moved out of the Penitentiary.

I. *Present Status of Reception Center Population*

The Reception Center is presently operating under a Federal Court Mandate prohibiting the housing of any Division of Correction residents in the Baltimore City Jail. In view of this, a contingent of 15 beds are kept vacant daily for any admissions being received from Baltimore City Courts.

As a result of a second Federal Court Order concerning a Class Action Overcrowding Suit, the Reception Center is making an effort to eliminate double celling in the facility by reducing the total number of beds available. At present, MRDCC houses 427 inmates in 260 cells.

II. *Proposed Plan*

We propose the entire Reception Center population, including Segregation and Protective Custody, be moved to the South Wing Housing Unit of the Penitentiary and all Penitentiary residents be

moved to the West Wing. This move would be made immediately. The construction required is not a security factor but rather a safety factor and would not impair the population movement.

The South Wing at present has 310 beds consisting of 250 singles and 30 doubles. "B" Block has 426 beds consisting of 86 singles and 170 doubles. The difference in housing is 117 beds.

At present, many inmates are staffed and sent to MCI and MHC that are borderline classifications that could be sent to the Maryland Penitentiary. They are sent to MCI and MHC because of housing availability. We will alter staffing patterns and do reclassifications in order to fill the West Wing with the difference in 117 total beds. We will also give the Maryland Penitentiary consideration and priority in transferring persons from the Maryland Penitentiary to less secure institutions, until adequate single celling is achieved in the West Wing.

*Results of Proposed Plan*

1. By the implementation of this proposed plan, the details of which are attached, the Reception Center will be able to increase services to the local facilities around the State by increasing the number of visits to local jails by the Mobile Unit.

2. More people will be processed in the local jails and follow the "Walk Through" Procedure.

3. There will be no intermingling of MRDCC and Penitentiary residents.

4. Management problems should be reduced for several reasons:

 A. There will be no "mixture" of the populations to cause concern.

 B. The population of MRDCC will be reduced.

 C. Everyone will be single-celled, thereby meeting the requirement of another Federal Court Mandate.

5. The Reception Center will be able, by a newly devised intake procedure, to assign cell space in an area in the housing unit appropriate to the needs of the individual.

*Example:*

A. First Offenders on one tier.

B. Protective Custody on another tier.

C. Older, more experienced criminal types on a separate tier.

## CHANGING MRDCC FROM B–BLOCK TO D–BLOCK—SOUTH WING

1. Traffic Patterns from South Wing to MRDCC activities by use of back stairway:

 A. *Classification*:—inmates will come directly from the South Wing Block to the MRDCC Administration floor. They will travel to the Chapel Area, be held in a group and placed in the Classification holding area. Inmates will not go in Penitentiary population area.

 B. *Psychological Service and Social Work Department*:—inmates will come directly from the South Wing Block to the MRDCC Administration floor. They will travel to the Chapel and be held in a group and dispersed to the Psychology area or Social Work area on the same floor. Inmates will not travel in an area housing Penitentiary population.

 C. *Protective Custody*:—will be on a tier of the South Wing, separate and apart from Penitentiary population.

 D. *Segregation*:—will have a temporary segregation area on a tier of the South Wing, separate and apart from Penitentiary population.

 E. *Religious Services*:—will be in the Chapel Area; MRDCC inmates can walk directly from the South Wing to the Chapel Area without going into the Penitentiary population. Services will be conducted in the Chapel where supervised properly.

 F. *Recreation*:—will be in the South Wing flats—yard side and in the fenced in area bordering the South Wing. Outside recreation can be su-

pervised by Wing Officers and officers one and two yard posts.

G. *Dining Area*:—inmates will leave South Wing through the existing Rotunda into the fenced in yard along South Wing and up through the east door of the dining room. The west door will be secure and only MRDCC inmates will be in the dining room. Supervised Penitentiary inmates work the serving line and dishwasher.

H. *Hospital*:—inmates traveling to and from this area will be escorted.

I. *Commissary*:—inmates traveling to and from this area will be escorted.

J. *Visiting Area*:—inmates will enter the lower level through the South Wing and be escorted to the Visiting Room and turned over to the officer at the gate. Visiting area is under constant supervision. Inmates will be escorted back to the South Wing.

K. *Identification Area*:—inmates will enter the lower level through the South Wing under escort and be brought to the Identification Area. Identification custodial people will assume supervision and escort back to the South Wing entrance on the lower level.

L. *Receiving Area*:—inmates will be escorted from the Receiving Area along Forest Street wall, along the South Wing fenced in area and into the South Wing. There will be no contact with Penitentiary inmates.

2. Construction needed to effect change, would be to put grill work on the South Wing Stairway between the floors of the Administration floor and Chapel Area.

3. Staffing required for change from B–Block to South Wing:

With a constant crew of seven total custody staff in the South Wing, and no additional duties added; there will be no need to hire additional correctional officers.